[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 30, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-12765

_____

D. C. Docket No. 01-00106 CR-N

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LINDA WILLIAMSON,
a.k.a. Linda West,
DWIGHT FAULK, et al.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Alabama

_____

**(July 30, 2003)**

Before DUBINA and FAY, Circuit Judges, and DOWD[*], District Judge.

PER CURIAM:

_____

[*] Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

On June 27, 2001, a federal grand jury returned a thirty-one count indictment against Defendants-Appellants Dwight Faulk ("Faulk"), Linda Williamson ("Williamson"), and Brian and Jennifer McKee for conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 (Count 1), mail fraud in violation of 18 U.S.C. § 1341 (Counts 2-18), conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count 19), and money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (Counts 20-31). Following a joint jury trial, Faulk, Williamson and Brian McKee were found guilty on all charges. Jennifer McKee was found guilty for violation of 18 U.S.C. § 371, conspiracy to commit mail fraud. The Appellants timely appealed their convictions.

In this appeal, the Appellants challenge the sufficiency of the evidence against them, and challenge the District Court's admission of non-testifying codefendant Brian McKee's inculpatory statements to law enforcement personnel pursuant to *Bruton v. United States*, 391 U.S. 123 (1968).[1] After consideration of the parties' briefs and oral argument as well as an independent review of the entire record of trial, we conclude that there exists a sufficient legal basis for a reasonable jury to have

---

[1] The Appellants raise a host of additional issues for our consideration. Based on a thorough review of the record and consideration of oral argument, we find those issues to be without merit and, therefore, affirm the district court without extended analysis.

convicted the Appellants, and that the district court did not err in admitting Brian McKee's statements.

I. BACKGROUND

The Etowah Solid Waste Disposal Authority ("ESWDA") was established by the Etowah County Commission in September 1993 for the purpose of operating an inert landfill in Etowah County, Alabama. The ESWDA consisted of a five-member Board of Directors tasked by the Etowah County Commission with the responsibility of overseeing the operation of the landfill.

Because the Etowah County landfill did not meet certain federal and state guidelines, it only accepted disposal of non-putrescible waste such as construction and demolition ("C&D") materials and other inert, non-hazardous items. Putrescible waste such as household garbage was diverted from the Etowah County landfill to an Etowah County transfer station where, at considerable expense to the ESWDA, it was hauled to an adjacent county for disposal in a landfill that met the pertinent guidelines.

As it turns out, the Etowah County landfill was an extremely profitable venture for the ESWDA. However, the ESWDA was losing significant revenue through the transfer station as a result of having to separate and haul putrescible waste. Accordingly, the ESWDA sought to reduce the amount of putrescible waste entering

the transfer station and to maximize the non-putrescible waste entering the Etowah County landfill. To meet this objective, in March 1995, the ESWDA passed two resolutions drafted and presented by Brian McKee, the Solid Waste Administrator for the ESWDA. The first resolution provided for a fifty percent reduction in the dumping fee at the Etowah County landfill to recycling companies located in Etowah County.[2] The second resolution allowed commercial haulers to take advantage of the lower municipal rate provided that a minimum of 2,750 tons of waste were disposed of per month and that the hauler's account with the ESWDA was not past due. In August 1995, Brian McKee introduced and the ESWDA passed a third resolution which altered the 2,570 tons per month requirement for a commercial hauler to receive the municipal dumping rate. The new dumping requirement for a commercial hauler to qualify for the municipal rate was 100 tons per day. Finally, in August 1997 a fourth resolution was passed by the ESWDA concerning the minimum required dumping amount enabling a commercial hauler to qualify for the municipal rate. The

---

[2] At the time of the passage of the first resolution, commercial haulers of waste were required to pay a dumping fee of $20.00 per ton for use of the Etowah County landfill. The $20.00 per ton commercial dumping rate was in effect until September 1995, at which time the rate increased to $25.50 per ton. In addition to the commercial hauler rate, there existed a special municipal rate of $17.50 per ton. The municipal rate was also in effect at the time of the passage of the first resolution and at all times pertinent to this case.

fourth resolution provided that a commercial hauler was entitled to receive the municipal rate if 500 tons of C&D waste were dumped.[3]

Seven days following the passage of the first two resolutions, Faulk, Probate Judge of Crenshaw County, Alabama and Williamson, County Administrator for Crenshaw County, Alabama formed a company called Big Wheel Recycling, Inc. ("BWRI").[4] BWRI was formed by Faulk and Williamson in an attempt to take advantage of the discounted dumping rate available to commercial recycling companies located in Etowah County.[5] To this end, Faulk entered into contracts with four mobile home manufacturers located in Marshall County, Alabama to haul their C&D waste. Because of the discounted dumping rate at the Etowah County landfill, Faulk could offer the mobile home manufacturers significantly reduced hauling rates for their C&D waste and still earn a substantial profit for BWRI. In order to qualify for the discounted dumping rate, however, BWRI would have to meet certain criteria.

---

[3] The resolution did not specify the time period over which the minimum dumping requirement must be met in order to qualify for the municipal rate. However, witnesses testified and the government all but conceded at trial that the 500 ton requirement was monthly.

[4] Williamson owned 998 of the outstanding 1000 shares of BWRI's stock and served as President of the corporation. Faulk was the Chief Executive Officer of BWRI and controlled the day-to-day activities of the corporation.

[5] The government alleges that BWRI was formed as part of the conspiracy that existed between the Appellants wherein they sought to impermissibly receive discounted dumping rates at the Etowah County landfill through the assistance of Brian McKee.

Yet, as the government alleges, BWRI knowing and fraudulently received an $8.75[6] per ton dumping rate despite not meeting the criteria as established through the various ESWDA resolutions.

## II.  DISCUSSION

### A.  Sufficiency of the Evidence

The government contends that the Appellants engaged in an elaborate scheme to defraud the ESWDA through a pattern of mail fraud and money laundering in order to impermissibly take advantage of the $8.75 per ton discounted dumping rate available at the Etowah County landfill.  Simply explained, the government contends that Brian McKee directed employees of the ESWDA to give BWRI an $8.75 per ton dumping rate knowing that BWRI was not a recycling company located in Etowah County nor had met the minimum dumping requirements.  As payoff for knowingly and impermissibly being given the $8.75 per ton dumping rate, according to the government, BWRI would funnel profits earned from the four mobile home manufacturers back to Brian McKee through his wife Jennifer, an employee of BWRI who ran an office for BWRI out of her Etowah County home.  In total, the government contends that BWRI defrauded the ESWDA of approximately $1.4 million.

---

[6] The $8.75 per ton rate is the result of a fifty percent discount from the municipal rate of $17.50.

Appellants contend that there is insufficient evidence to sustain their convictions for mail fraud and conspiracy to commit mail fraud. Appellants' contention that there is insufficient evidence to sustain their convictions is an issue we decide *de novo*. *United States v. Miles*, 290 F.3d 1341, 1355 (11th Cir. 2002). We review the evidence to determine whether "a reasonable jury, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the government could find the defendants guilty as charged beyond a reasonable doubt." *United States v. Navarro-Ordas*, 770 F.2d 959, 966 (11th Cir. 1985) (internal citations omitted). A jury's verdict will be affirmed if the court determines that a "jury was rationally able to find that every element of the charged crimes was established by the government beyond a reasonable doubt." *See United States v. McCarrick*, 294 F.3d 1286, 1289-90 (11th Cir. 2002).

1. Mail Fraud

The government presented evidence that could lead a reasonable jury to conclude that the Appellants knowingly and willfully defrauded the ESWDA by receiving a discounted dumping rate of $8.75 per ton to which BWRI was not entitled. Whether BWRI was entitled to an $8.75 per ton dumping rate, at the most

basic level and as was hotly litigated at trial, concerns whether BWRI was a recycling company located in Etowah County.[7]

The Appellants argue that BWRI was a recycling company because it engaged in what they term "source separation" which, as described by the Appellants, entails providing the means for separation and segregation of putrescible waste from non-putrescible waste. Appellants presented evidence at trial from both experts and lay witnesses which they argue proves that BWRI was engaged in source separation and that source separation is part of the recycling process. On this point, the evidence at trial shows that BWRI provided large trash containers known as pans to the various mobile home manufacturers so that the putrescible waste of the manufacturers could be disposed of separately from the non-putrescible waste. Thereafter, BWRI would pick up the pans of non-putrescible waste and haul them to the Etowah County

---

[7] Appellants concede that BWRI never met the minimum dumping requirements needed to qualify for the municipal rate. The evidence further demonstrates that BWRI's account with the ESWDA was not paid and up-to-date. Appellants argue, however, that the first resolution is independent of the other resolutions and, although silent on this point, is intended to give a fifty percent discount from the municipal rate to those recycling companies located in Etowah County. In opposition, the government argues that the first resolution simply grants a fifty percent reduction from whichever rate would ordinarily apply and that in order to qualify for the $8.75 per ton rate, BWRI would have to be a recycling company located in Etowah County that had an up-to-date account with the ESWDA and met the minimum per month dumping requirement. While we need not resolve this issue, suffice it to say, a reasonable jury, based on all the evidence, could conclude that absent meeting the minimum dumping requirements and having an up-to-date account with the ESWDA, at best, a commercial recycling company located in Etowah County would qualify for a fifty percent discount from the commercial rate rather than from the municipal rate. Furthermore, BWRI's repeated failure to meet such criteria despite receiving the $8.75 per ton dumping rate is circumstantial evidence of the Appellants' intent to defraud the ESWDA and provides further support for the jury's verdict.

landfill for dumping.  The putrescible household garbage would also be picked up by BWRI, however, such waste was directed to a proper dump site.  Thus, as Appellants argue, source separation is certainly the beginning of the recycling process.

The government presented evidence at trial showing that outside of the limited cardboard recycling that occurred in 1995, BWRI did not act as a recycling company.  The government argued at trial and now argues on appeal that BWRI is, in reality, nothing more than a regular commercial hauler of waste.  Evidence in support of this position shows that the non-putrescible waste removed from the mobile home manufacturer facilities was simply transported to and dumped at the Etowah County landfill where it was covered in dirt.[8]  Thus, as the government contends and as the evidence demonstrates, the non-putrescible waste hauled by BWRI was not part of the recycling process because it was not destined for a recycling facility nor was it being recycled by BWRI.  We conclude, therefore, that although "source separation" may begin the recycling process in some instances, a reasonable jury could conclude that BWRI was not recycling because it simply transported the non-putrescible waste from the mobile home manufacturers to the Etowah County landfill to be dumped without hope of ever being recycled for further use.[9]

---

[8] Walter Nichols, a defense recycling expert, even testified that simply hauling non-putrescible waste to be dumped with no further expectation of that waste being converted and put to use is not recycling.  This conclusion was supported by the government's recycling experts.

[9] The government showed that on many occasions putrescible waste from the mobile home manufacturers was not separated from the non-putrescible waste.  Thus, on those

9

In further support of their position, Appellants argue that the evidence presented at trial shows that upon dumping of the non-putrescible waste at the Etowah County landfill, BWRI employees would sift through the rubble and would remove useable items such as carpet, wood, salvageable appliances, and copper wire for both personal use and resale. We simply conclude that a reasonable jury could have concluded that such activity does not qualify BWRI as a recycling company. The evidence shows that such activity, if it occurred, was sporadic at best. Further, the credibility of the main BWRI employee engaged in this practice, Bill Faulk, was significantly undermined as the government elicited from the witness that he would personally haul, dump, and look through four to five loads of waste per day weighing anywhere from four to six tons and, thereafter, would remove any salvageable items from the rubble and transport those items to his house for storage.[10]

Finally, the government presented the testimony of Larry Nobel, a driver for BWRI, who indicated that BWRI was not engaged in any recycling. This testimony is consistent with statements Faulk himself made to law enforcement officials and introduced into evidence wherein he indicated that BWRI was not engaged in

---

occasions, BWRI was illegally dumping putrescible waste at the Etowah County landfill.

[10] To describe this testimony as incredulous would be an understatement. As one witness during the trial described, this practice, if it occurred, amounted to nothing more than "pilfering." We conclude that a reasonable jury could have determined that this practice does not constitute recycling.

recycling activities.[11] Furthermore, statements from Brian McKee to law enforcement officials were introduced into evidence wherein he indicated that he knew what he was doing was illegal.[12] Thus, we conclude that a reasonable jury could conclude that BWRI was not a recycling company.[13] Therefore, we affirm Appellants' mail fraud convictions.[14]

## 2. Money Laundering

Appellants Faulk, Williamson, and Brian McKee contend that the evidence is insufficient to sustain their convictions for money laundering and conspiracy to commit money laundering. To obtain a conviction on a substantive Section

---

[11] Out of concern for a possible *Bruton* violation, the district court instructed the jury on two separate occasions that Faulk's statements were to be considered solely against him.

[12] Appellants Faulk, Williamson, and Jennifer McKee appeal the introduction of Brian McKee's statements to law enforcement as being admitted into evidence in violation of *Bruton*. The district court instructed the jury on two separate occasions that Brian McKee's statements were to be considered solely against him. As discussed below, we affirm the district court's admission of Brian McKee's statements into evidence.

[13] Because we conclude that a reasonable jury could conclude that BWRI was not a legitimate recycling company, we need not address in detail the evidence concerning whether BWRI was located within Etowah County. In summary, however, we conclude that a reasonable jury could conclude, as the government argues, that BWRI's attempt to run an office out of Jennifer McKee's Etowah County house was a sham, was part of the conspiracy to defraud the ESWDA, and is further evidence of the Appellants' knowing and willful attempt to receive an $8.75 per ton dumping rate for which BWRI did not legitimately qualify.

[14] Unlike her codefendants, Jennifer McKee testified in her own defense. Thus, per our circuit precedent, the jury was free to disbelieve her and use her testimony as substantive evidence proving her guilt. *See United States v. Cotton*, 770 F.2d 940, 945 (11th Cir 1985) ("When a defendant takes the stand in a criminal case . . . the jury is free to disbelieve him and reject his explanation as a complete fabrication."); *United States v. Goggin*, 853 F.2d 843 (11th Cir. 1988) (same); *see also, United States v. Allison*, 908 F.2d 1531 (11th Cir. 1990) ("The jury may view the defendant's false explanatory statement as substantive evidence proving guilt.").

11

1956(a)(1)(A)(i) promotional money laundering charge, the government bears the burden of proving beyond a reasonable doubt that: (1) the defendant conducted or attempted to conduct a financial transaction; (2) the defendant knew the property involved in the transaction represented the proceeds of unlawful activity; (3) the property involved was in fact the proceeds of the specified unlawful activity; and (4) the defendant conducted the financial transaction "with the intent to promote the carrying on of [the] specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i). We find that all of these required elements have been satisfied.[15]

The evidence amply demonstrates, as the government contends, that bank deposits of proceeds of the fraudulent activity were made by Appellants and that such deposits were designed to convert the checks received from the mobile home manufacturers into cash in order to capitalize on the fraud perpetrated upon the ESWDA. Thus, the depositing and cashing of checks that represented the proceeds of the mail fraud promoted not only the Appellants' prior unlawful activity, but also

---

[15] In their briefs, Appellants argue that the evidence is insufficient to constitute concealment and that the books and records of BWRI including all bank accounts were open, clean, and clear. However, concealment or an intent to conceal the nature or sources of the proceeds has no bearing in this case as it is not a required element of the offense for which Appellants were charged. Section 1956(a)(1) defines two separate money laundering offenses: those committed with the "intent to promote the carrying on of a specified unlawful activity," 18 U.S.C. § 1956(a)(1)(A)(i); and those committed with the intent "to conceal or disguise the nature, location, the source, the ownership, or the control of the proceeds of the specified unlawful activity," 18 U.S.C. § 1956 (a)(1)(B)(i). While Count 19 alleges both money laundering offenses, at some point the government appeared to abandon the concealment charge and focus exclusively on the promotional charge. Thus, in effect, Count 19 is in line with Counts 20-31 which allege only promotional money laundering.

their ongoing and future unlawful activity. Such evidence is sufficient to sustain a conviction for promotional money laundering. *See, e.g., United States v. Haun*, 90 F.3d 1096, 1100-01 (6th Cir. 1996). Further, since the ultimate object of the conspiracy was to transfer the unearned dumping rate into cash, the financial transactions were in furtherance of the ongoing conspiracy offense and are sufficient to sustain Appellants' convictions. *See United States v. Carcione*, 272 F.3d 1297 (11th Cir. 2001).

B. *Bruton*

Despite the efforts of defense counsel, government counsel, and the district court, Faulk, Williamson, and Jennifer McKee contend that the admission of statements of Brian McKee, even in their redacted form, violate *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). At trial, the government introduced through the testimony of Special Agent Keith Baker admissions of nontestifying codefendant Brian McKee wherein he indicated that "he was being paid because of his having gotten the recycling resolution passed and for giving Big Wheel the discounted rate of $8.75 a ton for dumping debris at the Etowah Solid Waste Disposal Authority." Faulk and Williamson argue that Brian McKee's statement facially implicates BWRI thus necessarily implicating them in violation of *Bruton*. Additionally, Special Agent Baker testified that Brian McKee stated that "money that came through Jennifer was his." Jennifer McKee argues that this facially

implicates her in violation of *Bruton*. For the following reasons we disagree and affirm the district court.

The Supreme Court held in *Bruton* that post-arrest statements made by nontestifying codefendants that facially incriminate other defendants are inadmissible into evidence because such statements violate the other defendants' Sixth Amendment rights to confront and cross-examine adverse witnesses. The Supreme Court concluded that "where the powerfully incriminating extra-judicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," limiting instructions by the court will not suffice to eliminate the prejudicial effect of the introduction of such statements. *Bruton*, 391 U.S. at 135-36. In *Richardson v. Marsh*, 481 U.S. 200, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), however, the Supreme Court had occasion to consider whether the confession of a nontestifying codefendant admitted during a joint trial that had been redacted to omit the names of all codefendants violated the rule established in *Bruton*. In that instance, the Court refused to apply *Bruton* and concluded that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with the proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson*, 481 U.S. at 211. The Court concluded

14

that in such a situation, the confession is not so "powerfully incriminating" that a limiting instruction given by the district court could not effectively eliminate any prejudicial effect to the codefendants. *Id.* at 208. The *Richardson* Court, however, "expressed no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Id.* at 211 n.5. That was an issue subsequently addressed by the Supreme Court in *Gray v. Maryland*, 523 U.S. 185, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998).

In *Gray*, a confession written by a codefendant that explicitly referred to the defendant was redacted to eliminate any reference to the defendant. However, the defendant's name was replaced with the word "deleted" or was simply left as a blank space. *Gray*, 523 U.S. at 188. When the government's law enforcement witness read the codefendant's confession into evidence, he said "deleted" wherever the defendant's name had been redacted. The witness then testified that following the receipt of the codefendant's confession, he arrested the defendant. The Supreme Court concluded that the "obviously redacted confession" violated *Bruton* because it "pointed directly to the defendant." *Id.* at 194. Thus, the Court concluded that the redacted confession "facially incriminated" the defendant and "involved inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id.* In reaching this conclusion, the Court distinguished its

decision in *Richardson* where the redacted confession "became incriminating 'only when linked with evidence introduced later at trial.'" *Id.* at 196 (quoting *Richardson*, 481 U.S. at 208).

We find that the *Bruton* question raised in this case is covered by *Richardson*. In *Richardson*, the Supreme Court clearly authorized the admission of a nontestifying codefendant's confession where such confession omitted reference to the defendant and was coupled with a limiting instruction. We fail to see how the statement of Brian McKee implicates, directly or otherwise, Faulk or Williamson. Faulk's and Williamson's arguments to the contrary are unavailing. Brian McKee's statement reflects only that he was paid to pass the recycling resolution and give BWRI a discounted dumping rate. The statement, as quoted above, does not facially implicate Faulk or Williamson as was the case with the confession the Supreme Court addressed in *Bruton*, nor was the statement "obviously redacted" as was the case in *Gray*. The statement itself is silent as to who paid Brian McKee. Furthermore, even assuming that it is self-evident that BWRI was paying Brian McKee for passing the resolution and giving the discounted rate, naming BWRI does not facially implicate either Faulk or Williamson. In order to make that inferential link, additional, independent evidence is needed. Simply because the government provided the jurors with the independent evidence needed to make that link does not create a *Bruton*

16

violation.[16] What the government accomplished in this case is what the Supreme Court specifically authorized in *Richardson*.

Brian McKee's statement concerning Jennifer McKee, however, does directly implicate her. However, Special Agent Baker's testimony on this point was a product of defense cross-examination wherein counsel for Faulk and Williamson asked Special Agent Baker:

> Q. Rather than claiming that Big Wheel paid him money, wasn't he really just saying that any money that Jennifer, his wife, got from Big Wheel, he claimed was his money? Isn't that basically the gist of what he was saying?
>
> A. He said money that came through Jennifer was his.

Because defense counsel received the very answer seemingly solicited, we are hard-pressed to conclude that a *Bruton* violation exists. Furthermore, counsel for Jennifer McKee did not object to the question or to the answer.[17] Because a timely objection was not interposed, we review the district court's admission of this evidence for plain error. *United States v. Foree*, 43 F.3d 1572 (11th Cir. 1995).

---

[16] By our conclusion, we do not mean to suggest that Brian McKee's statement did not potentially inculpate Faulk or Williamson. Rather, consistent with the Supreme Court's decision in *Richardson*, we simply conclude that the jury could follow the court's limiting instructions and limit the use of such statements to the proper defendant.

[17] We recognize that Jennifer McKee joined in Faulk's and Williamson's objections to the government's introduction of Brian McKee's statement. However, the material covered in this question and answer had not been presented by the government.

17

As we held in *Foree*, to satisfy the plain error standard, "a party must demonstrate: (i) that there was an error in the lower court's action, (ii) that such error was plain, clear, or obvious, and (iii) that the error affected substantial rights, i.e. that it was prejudicial and not 'harmless.'" *Foree*, 43 F.3d at 1578 (citing *United States v. Olano*, 507 U.S. 725, 732-37, 113 S. Ct. 1770, 1777-79, 123 L. Ed. 2d 508 (1993)). The defendant bears the burden of proving prejudice. *Id.* Finally, "even if all three of these prerequisites are fulfilled, the Courts of Appeals should correct such errors only when they "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S. Ct. 391, 392, 80 L. Ed. 555 (1936)).

We conclude that none of the *Foree* plain error prongs have been satisfied. Simply put, the statement concerning Jennifer McKee was the product of defense cross-examination, the answer provided be Special Agent Baker was specifically tailored to the question asked, and the district court did not err in failing to intervene as counsel failed to object or in any way bring the alleged error to the attention of the district court. Thus, it is readily observable that any error, even if we were to presume its existence, was not plain, clear, or obvious. Finally, we conclude that Jennifer McKee failed to prove that the error was not harmless. First, the two limiting instructions given by the district court dissipated any prejudice to Jennifer McKee.

18

Secondly, Jennifer McKee's testimony, with nothing more, clearly supports the jury's conclusion as to her guilt. Therefore, when the prejudicial effect of the admission of the statement is compared to the properly admitted evidence of Jennifer McKee's guilt, it appears clear that there is no reasonable probability that the improper statement contributed to the conviction. *Schneble v. Florida*, 405 U.S. 427, 432, 92 S. Ct. 1056, 1060, 31 L. Ed. 2d 340 (1967).

III. CONCLUSION

After a thorough review of the record and consideration of the parties' briefs and oral argument, we conclude that there is sufficient evidence to sustain the convictions of Faulk, Williamson, and Brian and Jennifer McKee. Furthermore, we conclude that the district court did not err in admitting Brian McKee's statements. Rather, we commend the district court for taking the time to conduct an extensive *Bruton* hearing and for tailoring the admission of Brian McKee's statements so as to ensure a fair trial for all Defendants.[18]

AFFIRMED.

---

[18]The dissent would find a violation of due process as to Brian McKee. We respectfully disagree. This very experienced district judge stated in his order of January 4, 2002, that he had considered the recommendation of the United States Magistrate Judge and the objections filed by the defendant Brian McKee. He also stated that he made an independent review of the file and then made his rulings. We believe that he did exactly what he says he did. In our opinion, this is in accord with United States v. Raddatz, 447 U.S. 667 (1980). We do not believe that there is any meaningful difference between the words "de novo determination" and "an independent review of the file." The ultimate decision was made by the district judge after reviewing the entire file. This meets the due process requirements according to Raddatz.

19

DOWD, District Judge, concurring in part and dissenting in part:

Initially, I concur in the affirmance of the convictions and sentences of the appellants Dwight Faulk, Linda Williamson and Jennifer McKee. I respectfully dissent as to the affirmance with respect to appellant Brian McKee.

The centerpiece of the government's case against Brian McKee was the recitation of his oral admission as offered by FBI Special Agent Keith Baker. Simply put, Agent Baker stated that Brian McKee told him "that he knew what he was doing was illegal" in the following testimony:

> Q.  Sir, did you have an opportunity to conduct an interview of Brian McKee?
>
> A.  Yes, I did.
>
> Q.  Did Mr. McKee tell you that his address is 400 Bachelor Chapel Road, Gadsden, Alabama?
>
> A.  He did.
>
> Q.  Did he tell you that Big Wheel Recycling was formed in 1995 and it is a corporation?
>
> A.  What year did you say, sir?
>
> Q.  Formed in 1995.
>
> A.  That's correct.
>
> Q.  Did McKee tell you that he brought forward the resolution to allow recyclers to get a discounted rate at the Etowah Solid Waste Disposal Authority?

A. Yes, he did.

Q. Did McKee claim that he was being paid because of his having gotten the recycling resolution passed and for giving Big Wheel the discounted rate of $8.75 a ton for dumping debris at the Etowah Solid Waste Disposal Authority?

A. Yes, he did.

Q. When he was asked if the board members knew of the $8.75 a ton rate, did he tell you that he was never questioned about it by any of them?

A. He did.

Q. Did he tell you that he left the $17.50 per ton rate on the weight scale bills so the manufactured housing companies would not know about the $8.75 a ton rate?

A. He did.

Q. Did he tell you that CEI also got the $8.75 a ton rate, and they were not entitled to it?

A. That is correct.

Q. Did he tell you that Sue Rogers did not know about the Big Wheel Recycling -- did not know about Big Wheel Recycling when the 50 percent discount resolution was passed?

A. That is correct.

Q. Did Mr. McKee tell you that he knew what he was doing was illegal?

21

A.     Yes, he did.[1]

Tr., Vol. 20 of 29 at 154-55.

In advance of trial, on August 3, 2001, Brian McKee filed a motion to suppress his statements "of any nature obtained...by any and all investigative officers." In addition to raising a *Miranda* claim,[2] Brian McKee alleged that the statements "were involuntary" for several reasons: (1) because statements made by the investigating officers to the defendant were intentionally false and misleading; (2) because the defendant was exhausted due to the late hour and the fact that the interrogation was so long in duration, causing him to suffer from shock and emotional trauma based on his concern for his wife; (3) because of the attitude of the investigating officers toward the defendant; (4) because of promises made by the investigating officers to the defendant; and (5) because the defendant was coerced by the investigating officers into making these statements.

A second motion was also filed on August 3, 2001 and stated in part as follows:

---

[1]The other appellants, Faulk, Williamson, and Jennifer McKee, all opposed the admission of Baker's testimony that Brian McKee had told Baker that McKee knew what he was doing was illegal as a violation of *Bruton v. United States*, 391 U.S. 123 (1968). I concur with my brethren that the admission of Brian McKee's testimony did not violate *Bruton.* My review of the record indicates that the government only used the admission of "illegality" against Brian McKee. Moreover, the district court properly limited the jury's consideration of the admission to the government's case against Brian McKee.

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

22

5.     The statements were involuntary because of statements made to the defendant by the investigating officers were intentionally false and misleading regarding their intentions concerning the interview.

6.     That all statements and interviews were made because of promises made by the investigating officers to the defendant regarding their intentions to bring charges against this defendant and the wife of this defendant. *That the statements were involuntary in that the government did not live up to their promises and therefore coerced the defendant into making these statements in hopes of gaining the reward which he was promised.*

R.E. at 6 (emphasis added).

The government filed a response on August 24, 2001 and replied to McKee's contention that the teachings of *Miranda* had been violated by demonstrating that McKee was never in custody during any of the three questioning sessions conducted on February 17, 2000, February 25, 2000, and March 14, 2001. Additionally, the government pointed out that Brian McKee was accompanied by counsel for the interviews of February 25, 2000 and March 14, 2001. However, the government's response ignored the allegations of a coerced statement.

The evidentiary hearing in response to Brian McKee's motion to suppress his statements was conducted on November 19, 2001 before a magistrate judge. McKee testified that he had been promised that if he cooperated with the investigation, his

23

wife would not be prosecuted. The government did not present any testimony to rebut the McKee claim of an involuntary admission.

Magistrate Judge Walker's Report and Recommendation filed on December 14, 2001 addressed the issue of voluntariness as raised by Brian McKee and recommended a denial of his motion to suppress.

On December 27, 2001, Brian McKee's counsel filed very thorough objections[3] to the Report and Recommendation of Magistrate Judge Walker.

On January 4, 2002, the district court, after stating that "he engaged in an independent review of the file," denied the objections of Brian McKee entered on December 27, 2001.

The watershed case of *Jackson v. Denno*, 378 U.S. 368 (1964), settled the dispute as to whether a judge should submit the issue of voluntariness of a confession to the jury with instructions to ignore the confession if the jury found the confession to be involuntary. The Court held that the issue of voluntariness was to be decided in a pre-trial setting by the judge. If the confession was deemed involuntary, it was not to be submitted to the jury.

---

[3]The Report and Recommendation was filed on Friday, December 14, 2001. McKee's counsel is located in Gadsden, Alabama. He filed the objections on December 27. No claim was advanced that the objections were filed untimely. The record is inconclusive as to whether Brian McKee's counsel received the Report and Recommendation on December 14. Consequently, for the purpose of this dissent, I conclude that the objections of December 27 were timely filed.

24

In this case, Brian McKee offered testimony on the issue of voluntariness. His testimony was not rebutted. In her recommendation, Magistrate Judge Walker opined that McKee's testimony was not credible and thus excused the lack of rebuttal by the government.

The ruling in *United States v. Raddatz*, 447 U.S. 667 (1980), with respect to the use of magistrate judges to conduct suppression hearings in criminal cases in United States District Court proceedings, merits discussion. By a 5-4 vote, the Supreme Court determined that the district court did not have to hear anew the conflicting testimony heard by the assigned magistrate judge who conducted the suppression hearing.[4] The defendant testified that he had made incriminating statements at a meeting with government agents only after "obtaining confirmation" from the agents of their earlier promise that the indictment against him would be dismissed if he cooperated. The agents testified at the suppression hearing and denied making the promise. Confronted with an issue of credibility, the magistrate judge filed a report which recommended that the defendant's motion be denied after stating: "I find the testimony of the Alcohol, Tobacco and Firearm Agents more credible. . . ; I find that Federal agents never advised [respondent] that charges against him would be dismissed, if he cooperated." The Seventh Circuit had ruled that Raddatz had been

---

[4]In so ruling, the Supreme Court reversed the contrary decision in *United States v. Raddatz*, 592 F.2d 976 (7th Cir. 1979).

25

deprived of due process by the procedure used and by the failure of the district court to rehear the testimony before accepting the recommendation of the magistrate judge. Nonetheless, the Supreme Court ruled that the due process rights of the defendant were protected by the Federal Magistrates Act because the district court acts as the ultimate decision maker on the defendant's suppression motion with broad discretion to accept, reject or modify the magistrate judge's proposed findings which include the discretion to hear the witnesses to resolve conflicting credibility claims. The majority held that the *de novo* determination of contested credibility assessments without personally rehearing the live testimony did not violate due process.

In the *Raddatz* decision, the majority opinion written by Chief Justice Burger described the actions of the district court after it received the magistrate's report as follows:

> Respondent filed objections to the Magistrate's report. In rendering its decision, the District Court stated that it considered the transcript of the hearing before the Magistrate on the motion to suppress, the parties' proposed findings of fact, conclusions of law, and supporting memoranda, and that it read the recommendation of the Magistrate and heard oral argument of counsel. Finding "that the three statements given by the defendant and sought to be suppressed were made voluntarily," the District Court accepted the recommendation of the Magistrate and denied the motion to suppress.

447 U.S. at 672.

In the case at hand, the district court stated, in response to the objections to the magistrate's report as it applied to the defendant Brian McKee's objections to the denial of the motion to suppress, simply that he made "an independent review of the file" and, based on that review, denied the motion. Contrary to *Raddatz,* there is no suggestion that the district court had considered the transcript of the testimony; there is no suggestion of a "*de novo* determination" of those portions of the magistrate's report, findings or recommendations to which the objections had been made, as required by 28 U.S.C. § 636(b)(1)(C). Furthermore, the absence of any suggestion of a *de novo* determination comes in a situation where, as pointed out by the magistrate and contrary to the conflicting testimony of the setting in *Raddatz,* the government did not even bother to offer rebutting testimony to the testimony of Brian McKee.

Under the circumstances as above outlined, and accepting the teachings of *Raddatz,* it is my view that the due process rights of Brian McKee were violated in

this case.[5]  To hold otherwise would be the equivalent of improperly delegating Article III powers.[6]

Consequently, I would reverse the conviction of Brian McKee, vacate his sentence, and remand for a new trial.

---

[5]I find support in *Martinez v. Estelle*, 612 F.2d 173, 180 (5th Cir. 1980), in which the Fifth Circuit found, after citing *Jackson v. Denno*, that "the record before us does not establish with 'unmistakable clarity' that the trial judge reliably determined the voluntariness of the confession.  *Jackson v. Denno* has not been satisfied."  *See also Jeffrey S. v. State Board of Education of State of Georgia*, 896 F.2d 507, 513 (11th Cir. 1990) (criticizing failure to conduct the requisite *de novo* review where the district court "relied heavily upon the magistrate's assessment of the evidence and his judgment in drawing reasonable inferences therefrom.");  *Stokes v. Singletary*, 952 F.2d 1567, 1576 (11th Cir. 1992) (criticizing district court's failure "to accord a *de novo* review of the magistrate's factual findings").  The majority here seems to be setting up a new standard of review based on the length of experience of the district judge.

[6]Although 28 U.S.C. § 636(b)(1)(B) permits a district judge to refer a motion to suppress to a magistrate judge for recommendations regarding disposition, § 636(b)(1)(C) "meticulously sets forth a *de novo* review procedure."  *Gomez v. United States*, 490 U.S. 858, 874 (1989) (holding that allowing a magistrate judge to conduct the *voir dire* for jury selection in a felony case was not harmless error, especially because it was "without any meaningful review by a district judge").  I doubt that the *Gomez* Court would find "meaningful" the cursory and unexplained "review of the file" conducted by the district court in the instant case.