[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-10197

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Dec. 17, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 08-20400-CR-DLG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MAURICE DORVILUS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 17, 2009)

Before CARNES and HULL, Circuit Judges, and GOLDBERG,* Judge.

PER CURIAM:

---

* Honorable Richard W. Goldberg, Judge, United States Court of International Trade,
sitting by designation.

Maurice Dorvilus appeals his conviction and 204-month sentence for possession of a firearm by a convicted felon, 18 U.S.C. §§ 922(g)(1) and 924(e). After review, we affirm.

**I.**

On the morning of April 22, 2008, Dorvilus' 13-year-old son was struck by a Miami-Dade police car while waiting at his school bus stop. Dorvilus spent the day at the hospital, where he was joined by other family members, and he left in the evening. While he was driving to the store, Dorvilus failed to make a complete stop at a stop sign. Paul Villaverde, a detective for the Miami-Dade Police Robbery Investigation Unit, saw that traffic violation, discovered an outstanding warrant for Dorvilus' arrest, and called for backup. Detective Willy Diaz responded, pulling up beside Dorvilus' white Cadillac Escalade, which was parked at the store.

The officers arrested Dorvilus after he exited the store. While patting him down, Diaz found a loaded .40 caliber Glock 27 handgun in Dorvilus' waistband. After securing the gun and continuing the pat down, Diaz removed an Apple iPhone from the right front pocket of Dorvilus' pants. The cellular phone contained roughly 600 photos, about 20 of which showed Dorvilus posing with money or what appeared to be firearms. One such photo was displayed on the

2

iPhone's "face page," which is visible when the iPhone is turned on and one of its buttons has been pressed. It showed Dorvilus holding what appear to be two handguns while standing next to a white Cadillac Escalade.

Dorvilus filed a motion to suppress the photos. At the suppression hearing, Diaz testified that the face page photo was immediately visible as he took the iPhone from Dorvilus' pocket. As for the other photos, Diaz testified that he found them by "unlocking" the iPhone and then scrolling through its photo directory. In his Report and Recommendation the magistrate judge found Diaz's account of the arrest to be credible and concluded that the motion to suppress should be denied. The judge reasoned that there had been no "search" of the face page photo because it was in plain view, and the other photos were found by a search incident to a lawful arrest. Continuing to press his contention that the Fourth Amendment required suppression of the photos, Dorvilus objected to the R&R. He also sought to achieve the same end by filing a motion in limine to preclude admission of the photos on Federal Rules of Evidence 403 and 702 grounds. His position was that the photos were unfairly prejudicial, and that the expert the government planned to use would not be able to positively identify any gun in the photos as the one seized from him at the time of his arrest.

3

The district court did not rule on Dorvilus' objections to the R&R or on his motion in limine before trial. The court did hear arguments on the motion in limine at the beginning of the trial but, viewing the photos as Rule 404(b) evidence, decided to wait until the court heard the government's evidence. The court's thinking apparently was that if the photos were not properly admissible under Rule 404(b), the other issues about their admissibility would be moot. The court did say that it would issue an order on the motion to suppress, but it did not do so during the trial. After hearing the other evidence, the court ruled from the bench that the photos could not be admitted under Rule 404(b). The jury found Dorvilus guilty. Three months later, the court entered a written order, purporting to make it nunc pro tunc to the date the trial began, which denied the motion to suppress, adopted the R&R over Dorvilus' objections, and ruled that his objections were moot because none of the photos had been admitted into evidence.

Because Dorvilus was classified as an armed career criminal under 18 U.S.C. § 924(e), he faced a 15-year minimum sentence. The court sentenced him to 204 months imprisonment, followed by five years of supervised release, and a $100 special assessment.

## II.

Dorvilus first contends that the district court erred by failing to rule on whether he had made a prima facie showing of purposeful racial discrimination during jury selection. See Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986).

The government used four peremptory strikes during the selection of the twelve regular jurors. Three of those strikes were used to remove African Americans from the jury and the fourth was against a non-African American. There were at least two African Americans left on the jury; maybe more.[1] And the government had two strikes that it did not use. See Fed. R. Crim. P. 24(b)(2) (entitling the government to six peremptory challenges against regular jurors in a non-capital felony case).

After the government used its first strike against an African American, the defense began to object: "Defense would note for the record that Juror No. 13 is a

---

[1] The government claims the jury included three African Americans, but the record is unclear. The government told the district court that "Jurors No. 14, 15, [whom] we didn't strike[,] are African-American women" and that "Juror No. 8 is an African-American man." However, prospective Juror 15 was not on the list that the courtroom deputy called out of those who had been selected to serve. At trial, the government did say, "Almost every juror in the back row we didn't strike is African-American," but the record does not disclose how many jurors were selected from those venire members on the back row. Thus, we know that the jury did include two African Americans (8 and 14) and there may have been others.

5

black female and we'd ask the government—." The court overruled the objection: "This is the first challenge, so there's no pattern, so if you're trying to raise a Batson issue at this early stage, overruled." The defense did not object after any of the government's next three strikes, two of which were also against African Americans.

At that point, twelve jurors had been selected to serve, but the court continued the selection process in order to seat alternates. The court gave each party two strikes and said that the alternate jurors would be the first two who were not struck. The defense struck Juror 31. The government then expressed its intention to strike Juror 36, an African American. The following exchange occurred:

> MS. BHARATHI: Your Honor, just for the record, this is now—I believe Juror No. 36 is a black female, so was Juror No. 17 and Juror 27.

> MR. RASHBAUM: Your Honor, with all due respect, Jurors No. 14, 15, we didn't strike are African-American women. Almost every juror in the back row we didn't strike is African-American. Juror No. 8 is an African-American man.

> THE COURT: I don't even think we're going to get to No. 36. Let me see. Irregardless of your challenge, what is your next peremptory challenge?

> MS. BHARATHI: Juror 32, Ms. Delgado.

> THE COURT: So the alternates are Gutierrez and Pintado and we don't even reach 36, so it's not necessary for me to even rule on the Batson challenge.

> MS. BHARATHI: Yes, sir.

6

THE COURT:  All right.  Thank you very much.

MS. BHARATHI:  Thank you, Judge.

We review de novo the constitutional issues presented by a Batson challenge, though we accord "great deference" to a district court's ruling on whether the objecting party established a prima facie case of discrimination. United States v. Brown, 299 F.3d 1252, 1255 (11th Cir. 2002).  We review Batson-related factual findings for clear error.  United States v. Novaton, 271 F.3d 968, 1001 (11th Cir. 2001).  "The Batson three-step procedure for evaluating an objection to a peremptory challenge is as follows: (1) the objector must make a prima facie showing that the peremptory challenge is exercised on the basis of race; (2) the burden then shifts to the challenger to articulate a race-neutral explanation for striking the jurors in question; and (3) the trial court must determine whether the objector has carried its burden of proving purposeful discrimination."  United States v. Allen-Brown, 243 F.3d 1293, 1297 (11th Cir. 2001).  All of that, however, assumes that Batson issues were preserved for appellate review by a proper objection.

We first address whether Dorvilus preserved by objection in the district court the Batson issues he is attempting to pursue before us.  If he did not, our review is only for plain error.  See United States v. Dudley, 463 F.3d 1221, 1227

7

(11th Cir. 2006). Dorvilus did object after the government's first strike, so any error the court committed at that point is preserved. But the court correctly overruled that objection as premature because no prima facie case had been shown at that early stage. One strike does not a pattern make, and at that point there was no other indication that the government was discriminating against African Americans.

Later, during the selection of alternates, when the government expressed its intention to strike Juror 36, defense counsel noted for the record that three of the jurors the government had already struck were African Americans. Although the court interpreted that as a <u>Batson</u> objection, it viewed the objection as going only to Juror 36. That is apparent from the judge's explanation a few minutes later that, because they had not reached Juror 36, it was unnecessary to rule on the objection. Dorvilus' counsel could have objected to the court's failure to rule on her objection if she had intended that the objection cover any of the earlier jurors who actually were struck, but she did not do that. Instead, she affirmatively agreed with the court's suggestion that the failure to reach Juror 36 made it unnecessary to rule on the <u>Batson</u> challenge. As a result, any error in the court's failure to rule was not properly preserved. <u>Cf. Hopson v. Fredericksen</u>, 961 F.2d 1374, 1377–78 (8th Cir. 1992) ("His failure to follow up on his <u>Batson</u> objection [after the

8

government offered race-neutral reasons for its strikes] could have been reasonably construed by the trial judge as an agreement that the expressed reasons were racially neutral. Because Hopson failed to properly preserve this issue for appeal by failing to object at trial, we must review his claim under the plain error standard.").

Because Dorvilus did not properly preserve any error in the court's failure to rule on whether he had established a prima face case of purposeful racial discrimination once the government made clear that it intended to strike Juror 36, if necessary, our review is only for plain error. "Before an error is subject to correction under the plain error rule, it must be plain under controlling precedent or in view of the unequivocally clear words of a statute or rule; it must have adversely affected the outcome of the proceedings; and it must be such that the failure to correct it would seriously affect the fairness, integrity or public reputation of judicial proceedings." United States v. Lett, 483 F.3d 782, 790 (11th Cir. 2007) (citing United States v. Olano, 507 U.S. 725, 732–37, 113 S. Ct. 1770, 1776–79 (1993)). We find no plain error. Even if it was error not to rule on whether there was a prima facie case, and even if the error was plain, Dorvilus has not established that there is a reasonable probability of a different result at his trial if the court had ruled. See United States v. Rodriguez, 398 F.3d 1291, 1299–1306

9

(11th Cir. 2005) (explaining that the third component of the plain error test requires a defendant to show that but for the claimed error there is a reasonable probability that the result of the proceeding would have been different).  Dorvilus has not established that if the court had ruled on whether he had established a prima facie case, the ruling would have been in his favor; nor has he established that the government would not have been able to articulate a race-neutral explanation for its strikes; nor has he established that he would have been able to convince the court that the government's reasons were pretextual.

We have held that "the unchallenged presence of two blacks on the jury undercuts any inference of impermissible discrimination that might be argued to arise from the fact that the prosecutor used three of the four peremptory challenges he exercised to strike blacks." United States v. Dennis, 804 F.2d 1208, 1211 (11th Cir. 1986).  We reaffirmed that holding recently in United States v. Campa, 529 F.3d 980, 998 (11th Cir. 2008), which referred to Dennis as a "well-established precedent."  Here, as in Dennis, the government used three of the four peremptory challenges it exercised to strike African Americans, allowed at least two African Americans to be seated on the jury, and did not use all of its peremptory challenges.  We held in Dennis that the district court would have erred as a matter of law if it had found an inference of impermissible discrimination in these

circumstances. Dennis, 804 F.2d at 1211; see also Campa, 529 F.3d at 998. Dorvilus invites us to reconsider Dennis and Campa, asserting that they are in tension with Supreme Court precedent. We cannot do that, because we are bound by our prior panel precedent. See, e.g., United States v. Emmanuel, 565 F.3d 1324, 1332 (11th Cir. 2009).

Dorvilus cites McGahee v. Alabama Department of Corrections, 560 F.3d 1252 (11th Cir. 2009), for the proposition that the district court's failure to rule on whether he made a prima facie showing under Batson was itself reversible error. In McGahee we concluded that a state court unreasonably applied clearly established federal law by denying the defendant's Batson challenge "based only upon the State's proffer of generalized reasons for its peremptory challenges, and because the trial court failed to make any ruling following the State's proffer of individualized reasons for its peremptory challenges." Id. at 1257. McGahee is different from this case because it involved the failure of the district court to rule under step three of the Batson framework—after the defendant had established a prima facie case of discrimination (step one) and the state had articulated a race-neutral explanation (step two). See id. at 1259 n.7 & 1260. At step three, "after a prosecutor has made his proffer of specific explanations, the trial court must make a determination of whether the defendant has established purposeful

11

discrimination." Id. at 1260 (emphasis added); see also Batson, 476 U.S. at 98, 106 S. Ct. at 1724; Allen-Brown, 243 F.3d at 1297. But in this case the district court never determined that there was a prima facie case, so McGahee's discussion of what courts should do after they decide that a prima facie case has been established does not apply. See, e.g., United States v. Ochoa-Vasquez, 428 F.3d 1015, 1044 n.38 (11th Cir. 2005) ("[D]istrict courts usually make the prima-facie-case determination under Batson's first prong. Yet, that is not necessary if, as a matter of law, the defendant's evidence on the Batson issue is insufficient to show a prima facie case." (citations omitted)).

Moreover, it appears from the record that if the court had found a prima facie case, the government would have been able to articulate race-neutral reasons for striking the three African Americans it did. The father of Juror 13's children was incarcerated. Juror 17 had a family member involved in a criminal case a few years ago, and she admitted that she has "some issues like about judging things that I don't know about and . . . a strong thing about going off my opinion about situations." Juror 27 was an investigator for the state public defender. (The government did not actually strike Juror 36, but it would have had an obvious race-neutral reason for doing so: her child was incarcerated at the time of the trial.)

12

Not only that, but Dorvilus certainly has not established that if he had insisted on his suggestion that there might be a <u>Batson</u> problem and if one or more of the government's strikes had been disallowed, the result of the trial would have been different. As we explained in <u>Rodriguez</u>, "where we would have to speculate—the appellant has not met his burden of showing a reasonable probability that the result would have been different but for the error; he has not met his burden of showing prejudice; he has not met his burden of showing that his substantial rights have been affected." 398 F.3d at 1301. Dorvilus has not shown plain error.

## III.

Dorvilus contends he was denied due process and his ability to present a defense was hampered because the district court did not make "a de novo determination" of the disputed portions of the magistrate judge's R&R on the motion to suppress the photos on his iPhone. <u>See</u> 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").

Dorvilus argues that the district court judge could not accept the magistrate judge's credibility findings without conducting a new evidentiary hearing. The Supreme Court has rejected that interpretation of § 636(b)(1). <u>See</u> <u>United States v.</u>

Raddatz, 447 U.S. 667, 674–76, 100 S. Ct. 2406, 2411–13 (1980).  A district court is not required to rehear witness testimony when accepting a magistrate judge's credibility findings.  Id.  The Court explained:

> [T]he statute calls for a de novo determination, not a de novo hearing. We find nothing in the legislative history of the statute to support the contention that the judge is required to rehear the contested testimony in order to carry out the statutory command to make the required "determination."

Id. at 674, 100 S. Ct. at 2411.  Not only that, but "to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."  Id. at 676 n.3, 100 S. Ct. at 2412 n.3.

While we have "held that generally a district court must rehear the disputed testimony before rejecting a magistrate judge's credibility determinations," United States v. Cofield, 272 F.3d 1303, 1306 (11th Cir. 2001) (emphasis added and citations omitted), that is not what happened here.  Because the district court accepted the magistrate judge's findings, Raddatz controls, and no new hearing was required.  See Amlong & Amlong, P.A. v. Denny's, Inc., 500 F.3d 1230, 1245 (11th Cir. 2007).

14

Dorvilus also contends that the district court failed to review de novo the parts of the record underlying the disputed conclusions in the R&R. The statutory obligation of the district court to give independent consideration to those portions of the R&R to which objection is made does require the court to consider the actual testimony relevant to the objections, and not merely the R&R. See Stokes v. Singletary, 952 F.2d 1567, 1576 (11th Cir. 1992). But the order denying the motion to suppress indicates that the district court had conducted "a review of the record"—not merely the R&R, but "the record." We believe the district judge did exactly what he says he did. See United States v. Williamson, 339 F.3d 1295, 1305 n.18 (11th Cir. 2003); see also United States v. Hamell, 931 F.2d 466, 468 (8th Cir. 1991).

Dorvilus further contends that he was entitled to a ruling on his motion to suppress before the trial got underway. We review only for an abuse of discretion a district court's decision to reserve ruling on a pretrial motion until after the trial begins. United States v. Beard, 761 F.2d 1477, 1479 (11th Cir. 1985). We have stated that "good cause for deferral exists only if facts at trial will be relevant to the court's decision, but a district court must rule on any issue entirely segregable from the evidence to be presented at trial." United States v. Adkinson, 135 F.3d 1363, 1369 n.11 (11th Cir. 1998) (quotation marks and citation omitted); see also

15

Fed. R. Crim. P. 12(d). Here, the facts at trial were not entirely segregable from the motion to suppress. For example, during the trial defense counsel elicited testimony that the officers did not perceive any threat to their safety during the arrest, a fact relevant to whether the iPhone photos were the product of a search incident to a lawful arrest. That illustrated the good cause the district court had to defer its ruling on the motion to suppress.[2]

Even if we were to conclude that the district court erred in deferring its ruling on the motion to suppress, any resulting error was harmless because the jury never saw any of the photographs. At oral argument, defense counsel argued that the timing of the ruling was prejudicial, characterizing the risk of opening the door to the photos as a "sword of Damocles" that hung over the defense throughout the trial. By that Dorvilus means that because there was no pretrial ruling he had to be concerned that evidence he might present would open the door to admission of the photos. The problem with that argument is the motion to suppress was denied, not granted. Telling Dorvilus before trial that the motion was denied would only have sharpened the sword, not removed it.

---

[2] Dorvilus argues that a pre-trial ruling was necessary because Rule 12(d) states that "[t]he court must not defer ruling on a pretrial motion if the deferral will adversely affect a party's right to appeal." That exception is irrelevant to this case, because the timing of the district court's decision does not affect Dorvilus' right to raise the suppression issue on appeal. See United States v. Thompson, 558 F.2d 522, 525 (9th Cir. 1977).

16

Dorvilus half-heartedly challenges the merits of the decision to deny his motion to suppress, arguing that Diaz was not credible at the suppression hearing when he testified that the face page photo was visible as he took the iPhone from Dorvilus' pocket.[3]  The magistrate judge's credibility determination, which the district court adopted, is supported by the record and certainly was not "contrary to the laws of nature" or "so inconsistent or improbable on its face that no reasonable factfinder could accept it."  United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (citation omitted).  Because Diaz's testimony is credible, we take as a fact that the face page photo was in plain view and the motion to suppress was properly denied as to it.  We need not decide whether the other photos were the product of a search incident to a lawful arrest because the possibility of the face page photo being admitted was enough to deter Dorvilus from changing his defense strategy—even if all the other photos were due to be suppressed.  Thus, Dorvilus was not prejudiced by any error—if there be one—with regard to the timing of the district court's ruling on the motion to suppress.

---

[3] Rulings on motions to suppress generally entail mixed questions of law and fact, so we "review a district court's factual findings for clear error and its application of the law to those facts de novo."  United States v. Tovar-Rico, 61 F.3d 1529, 1534 (11th Cir. 1995).

## IV.

Leaving the timing of the ruling on the motion to suppress, which was based on Fourth Amendment grounds, Dorvilus moves to the timing of the ruling on the motion in limine, which was based on his Rule 404(b) and Rule 403 objections to the admission of the iPhone photographs. He insists that the court should not have waited until the end of the trial to rule on that motion. We review evidentiary decisions only for abuse of discretion and cannot reverse "unless the ruling is manifestly erroneous." United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc) (quotation marks and citation omitted).

The court clearly had good cause for not deciding this issue before trial, as Dorvilus would have preferred. See United States v. Jernigan, 341 F.3d 1273, 1286–87 (11th Cir. 2003) ("[O]ne of the primary components of the Rule 404(b) calculus is the strength of the government's evidence, a matter that plainly cannot be properly ascertained until the trial itself." (citation omitted)). A pre-trial ruling would have been subject to change, in any event. See Luce v. United States, 469 U.S. 38, 41–42, 105 S. Ct. 460, 463 (1984) ("[E]ven if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."); accord United States v. Hall, 312 F.3d 1250, 1256 (11th Cir. 2002).

18

Once the trial began, the court did not abuse its discretion by waiting to rule on the admissibility of the photos until the other evidence was presented, because the other evidence was relevant to the decision of the motion. Trial judges are not required to decide evidentiary issues in hypothetical terms, because "probativeness and prejudice" are "fact- and context-intensive inquiries that can only be competently made by the district court upon assessing first hand the evidence presented by both parties." Jernigan, 341 F.3d at 1287; see also United States v. Ellisor, 522 F.3d 1255, 1268 (11th Cir. 2008). The district court gave essentially that rationale for its "wait and see" approach, and we conclude that its handling of the motion was not an abuse of discretion.[4]

When the court did rule, it decided that the government could not introduce the photos. That means that any error in deferring the ruling was harmless. The defendant should not be heard to complain that if the court had ruled earlier he might have put in some evidence helpful to his defense that he was afraid to put in

---

[4] Dorvilus suggests that the district court's finding that the government could not prove that the photos depict real firearms undermines its rationale for deferring its ruling. But that argument overlooks the value to the government of introducing the photos to rebut suggestions that the officers planted the gun or otherwise mishandled evidence. We doubt that a reasonable jury would have believed, for example, that the officers planted a gun that just happened to resemble the "toy guns" with which the defendant was photographed. Dorvilus did not argue that the government planted the Glock taken from his possession, but the possibility of such a defense was one reason the district court adopted a wait-and-see approach rather than ruling early in the trial.

without assurance that it would not open the door to admission of the photos, because if the defendant had put on that other evidence the court would have been entitled to revisit and change its ruling. You put on your evidence and you take your chances. Which is another way of saying that a defendant does not have a right to advice from the district court about how it will rule on evidentiary issues, especially those that depend on how the evidence unfolds.

## V.

Dorvilus contends that the government presented an inadequate foundation for admission of the firearm. At trial, Diaz testified that he had placed the firearm he took from Dorvilus' waistband into a plastic bag, which Detective Dweck brought to his and Lang's vehicle. Lang testified that he saw Dweck place the bag into their vehicle. Lang completed the part of the property receipt where the make, model, and serial number of the gun are listed. The serial number on the receipt matches the serial number of the Glock firearm that was entered into evidence. Dweck's name is listed as the swearing officer on the receipt, but he testified at the suppression hearing that it was not his signature.[5] Dorvilus argues that the court erred in admitting the firearm because there was evidence of forgery.

---

[5] Dweck was unable to testify at trial because his wife had a miscarriage on the first day of it.

20

We review the district court's ruling only for abuse of discretion. United States v. Russell, 703 F.2d 1243, 1249 (11th Cir. 1983).

Dorvilus' argument fails because there "need be only some competent evidence in the record to support authentication" under Federal Rule of Evidence 901, and such evidence can be purely circumstantial. United States v. Hawkins, 905 F.2d 1489, 1493 (11th Cir. 1990) (quotation marks and citation omitted). Although testimony explaining why someone besides Dweck signed his name to the receipt would have been helpful, Lang's testimony with regard to the matching serial numbers was sufficient for purposes of Rule 901. As the district court noted, Dorvilus was free to make his chain-of-custody arguments to the jury. "Challenge to the chain of custody goes to the weight rather than the admissibility of the evidence. Thus, the adequacy of the proof relating to the chain of custody is not a proper ground to challenge the admissibility of the evidence." United States v. Lopez, 758 F.2d 1517, 1521 (11th Cir. 1985) (citation omitted); see also United States v. Roberson, 897 F.2d 1092, 1096 (11th Cir. 1990); United States v. Caldwell, 776 F.2d 989, 1001–02 (11th Cir. 1985); United States v. Clark, 664 F.2d 1174, 1176 (11th Cir. 1981).

## VI.

Because of the imperfections in the evidence involving the handling of the Glock, Dorvilus contends that the district court abused its discretion in denying his motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. "We review the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the verdict." United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006) (citation omitted). "The jury gets to make any credibility choices, and we will assume that they made them all in the way that supports the verdict." Id. (citation omitted). A reasonable jury could have believed that Diaz's account of the arrest was credible and that the matching serial numbers proved that the gun introduced at trial was the one taken from Dorvilus during his arrest. Because the evidence supports the jury's finding of guilt beyond a reasonable doubt, the district court correctly denied Dorvilus' Rule 29 motion.

## VII.

Dorvilus claims that the cumulative effect of any errors deprived him of a fair trial. Specifically, he argues that the district court's exclusion of evidence of a family gathering, its denial of his request for a missing evidence instruction, and the "errors" that we have already discussed amount to cumulative prejudice.

22

Dorvilus' argument about the family gathering is that the district court should have allowed him to put on evidence from some of those present at it that he had been there shortly before the arrest. At trial, Dorvilus asserted that evidence was important because he was around many people at the gathering and they could testify that he did not possess a firearm then. The district court saw a disconnect between evidence showing that Dorvilus did not have a firearm in a group of individuals and the government's allegation that he had a firearm later inside of a car. We see the same disconnect. Evidence of the family gathering had minimal relevance and might have only confused or misled the jury. It certainly was not "manifestly erroneous" for the district court to so conclude. See Frazier, 387 F.3d at 1258 (quotation marks and citation omitted).[6]

Dorvilus argues to us that evidence of the family gathering was also necessary to counter the perception that he was involved in illegal activity at the time of his arrest. He points out that the jury had these questions: "Is it possible to get information as to why was the defendant stopped? What was the lawful arrest?" That argument is not properly before us because Dorvilus did not make it to the district court. In any event, with the parties' agreement the court answered

---

[6] Dorvilus argues in his brief, without citation to the record, that the family gathering was "only minutes" before Dorvilus left the hospital. We have found nothing in the record supporting that statement, and he did not make that assertion to the district court anyway.

the jury's questions by informing it that the parties had stipulated that the arrest was lawful and that the nature of the arrest was irrelevant. We must presume that the jury followed that instruction. E.g., United States v. Stone, 9 F.3d 934, 938 (11th Cir. 1993).

At trial, Dorvilus established that the officers used a radio frequency over which communications were not recorded, in violation of a departmental policy that all radio communications should be recorded. Dorvilus argues that the district court erred in denying his request for this jury instruction:

> Where the government has intentionally or recklessly destroyed, suppressed, or otherwise failed to preserve evidence that would be relevant to the issue of the guilt or innocence of the defendant, you may infer that such evidence, if it were produced, would be favorable to the defendant and adverse to the government.

We review the denial of a requested jury instruction only for abuse of discretion. United States v. Morales, 978 F.2d 650, 652 (11th Cir. 1992).

The district court did not abuse its discretion. Although "the defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence," United States v. Lively, 803 F.2d 1124, 1126 (11th Cir. 1986) (quotation marks and citation omitted), there was no basis in the evidence for the requested instruction. The officers' failure to create evidence by recording their conversations is simply not the same as destroying, suppressing, or failing to preserve existing evidence. Because there is no suggestion that the

24

government possessed any recordings or other materials that it refused to turn over to Dorvilus, the decisions he cites about missing or withheld evidence are inapposite. It would be legally incorrect for the jury to presume that recordings of the officers' conversations "would be favorable to the defendant" if they had been created. See United States v. Stone, 702 F.2d 1333, 1339 (11th Cir. 1983) (no reversible error if the requested instruction is incorrect). Moreover, Dorvilus' ability to defend was not "seriously impaired" by the failure to give the requested instruction. See id. The evidence supporting his theory was weak, at best, especially because the officers testified that they thought their comments were being recorded.

Finally, Dorvilus argues that the cumulative effect of all these alleged errors deprived him of his right to a fair trial. Because Dorvilus has not established that the district court committed any reversible error, or that the alleged errors affected his substantial rights, he cannot establish cumulative error. See United States v. Hoffman-Vaile, 568 F.3d 1335, 1342 (11th Cir. 2009).

## VIII.

Dorvilus raises three additional issues, all of which clearly lack merit. First, he contends that 18 U.S.C. § 922(g) is unconstitutional under the Commerce Clause, because it allegedly fails to require proof of a substantial nexus between

the offense and interstate commerce. As Dorvilus acknowledges in his brief, our binding precedent forecloses that argument. See United States v. McAllister, 77 F.3d 387, 389 (11th Cir. 1996). Dorvilus also makes an as-applied challenge to the statute, which fails as well. Special Agent Murr testified that Dorvilus' Glock was manufactured in Austria and the ammunition was made outside of Florida.

Finally, Dorvilus contends that it was unconstitutional under the Fifth and Sixth Amendments for the district court to raise his sentence based on prior convictions not charged in the indictment, stipulated to, or proven beyond a reasonable doubt to a jury. Our precedent forecloses that claim. See United States v. Greer, 440 F.3d 1267, 1273–74 (11th Cir. 2006). We also note that Dorvilus admitted to the existence and character of his prior convictions by failing to object to all but one of the convictions listed in his PSR. See United States v. Shelton, 400 F.3d 1325, 1330 (11th Cir. 2005). Moreover, his attorney conceded that Dorvilus "qualified as an armed career criminal."

**AFFIRMED.**

26