[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 16, 2010
JOHN LEY
CLERK

No. 08-13434

DC Docket No. 07-00090-CR-J-33-HTS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERT J. JENNINGS,

Defendant,

DONALD E. TOUCHET,
RICHARD E. STANDRIDGE,

Defendants-Appellants.

Appeals from the United States District Court
for the Middle District of Florida

(March 16, 2010)

Before BLACK, MARCUS and HIGGINBOTHAM,* Circuit Judges.

_____

* Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit,
sitting by designation.

HIGGINBOTHAM, Circuit Judge:

Richard E. Standridge and Donald E. Touchet[2] were indicted on numerous counts of conspiracy,[3] mail and wire fraud,[4] and money laundering,[5] charging participation in a scheme to sell fraudulent workers' compensation insurance. A jury convicted on all counts and the district court sentenced Standridge to 216 and Touchet to 264 months' imprisonment. Both appeal their convictions and sentences on multiple grounds. We find no error and affirm.

I

Government witnesses described the workings of the industry in which the alleged offenses occurred. It is useful to begin there. Workers' compensation insurance provides wage loss and medical expense reimbursement to individuals injured while working. Most employers carry workers' compensation insurance for their employees and states require employers to obtain a certificate of insurance from

---

[2] Robert J. Jennings, died in prison on December 4, 2009. Accordingly, his appeal was dismissed as moot and his case was remanded to the district court to vacate the judgment and dismiss the indictment. *United States v. Jennings*, No. 08-13434 (11th Cir. Jan. 5, 2010) (order dismissing appeal as moot and remanding case to vacate the judgment and dismiss the indictment); *see also United States v. Romano*, 755 F.2d 1401 (11th Cir. 1985).

[3] 18 U.S.C. § 371.

[4] 18 U.S.C. §§ 1341, 1343, & 2.

[5] 18 U.S.C. §§ 1956(a)(1)(A)(i) & 2.

the insurance company demonstrating they are covered or have otherwise assured protection for their employees. Companies that sell workers compensation insurance—termed carriers—are heavily regulated by the states. Every state requires carriers to be "admitted" before operating within the state: Carriers must satisfy various financial and administrative requirements and pay into "guaranty" funds used to pay claims when an admitted carrier is unable to do so. That a carrier must be admitted in order to insure employees within a state is common to the workers' compensation industry.

Many employers outsource their human resource department to a professional employer organization. PEOs operate by hiring the client employer's employees and then leasing them back to the client—so that the client's employees become the employees of the PEO. The client pays the PEO the costs of payroll plus a fee for services. PEOs also must be licensed by the state and have proof of valid workers' compensation insurance. A PEO failing to meet state regulatory requirements will face a stop-work order from the state requiring the PEO to cease all operations in the state.

The final gear in the workers' compensation machine is the third party administrator. Third party administrators work for both the carrier and the PEO in administering the actual claims—in effect acting as an insurance company's claims

department. The administrator evaluates the merits of an employee's claims and pays the bills for valid claims under the policy. It often has the most day-to-day contact with the client companies and their employees. Like the other participants, third party administrators are regulated by the states which seek to ensure claims are paid in a timely manner.

II

The government argued at trial that Touchet and Standridge participated in a wide-reaching scheme to defraud employers and their employees through the sale of sham workers' compensation insurance, that together with their coconspirators, they utilized professional employer organizations to sell fraudulent insurance to client companies, that the fraud left the employees without workers' compensation insurance, and that many injured and disabled employees, unable to collect compensation, were abandoned without financial recourse.

Government witnesses offered the following account of relevant events: The fraud began in late 2000 when TTC, a PEO, began to search for a new source of workers' compensation insurance after its previous carrier became insolvent. Touchet and his business associate, Thomas Brown, had been doing business with TTC and learned it needed workers' compensation insurance. Touchet contacted Jerry Brewer

4

at United Insurance about potential available insurance who told him coverage was available through his Regency Insurance of West Indies, Limited. Brown proposed Regency but TTC declined, aware that Regency was nonadmitted and could not legally be engaged. After a number of attempts to find legitimate workers' compensation insurance failed, including an attempt to secure insurance through Brown's brother's company, TTC became desperate—fearful that without workers' compensation insurance it would be shut down. TTC finally agreed to Brown and Touchet's proposal and in February 2001 purchased workers' compensation insurance from Regency at the cost of $1.8 million a month.

Touchet prepared a policy for TTC—taking a sample workers' compensation policy from another carrier, copying it with Regency's name, and making up a policy number. While the policy itself recited that Regency was a nonadmitted carrier, Touchet provided TTC with certificates of insurance without this critical disclosure to be furnished to TTC's clients.

TTC's third party administrator refused to continue with a nonadmitted insurer. Earlier Standridge had contacted Brown and Touchet regarding the possibility of becoming the third party administrator for TTC's workers' compensation insurance. Standridge owned and operated a healthcare third party administrator, Global Healthcare Corp., and argued he could keep insurance costs down by aggressively

5

managing the claims. He also claimed to Brown that he could run "roughshod" over state regulators concerned about Regency. Now needing a new administrator, TTC turned to Global Healthcare.

Almost immediately the problems began. In March 2001, TTC refused to pay the March premium, complaining to Standridge that claims had not been paid and that states were rejecting Regency as a nonadmitted carrier. Standridge assured TTC that he would deal with the regulators but at the moment he could not pay claims because Brown had not remitted money from TTC's premium.

On April 12th, 2001, Brown, Standridge, Touchet, and Jennings—who was the administrator for some of TTC's health insurance—met with TTC at their offices in Kankakee Illinois. A heated argument ensued over Regency's failure to pay claims, TTC's failure to pay premiums, and states' refusal to accept Regency. Brown, Touchet, and Standridge agreed TTC could use Regency until valid insurance could be obtained without regulators interfering. Standridge acted as a mediator, suggesting that regulators would be placated if claims were paid and he had direct control over TTC's premiums. It was eventually resolved that TTC would pay the premiums directly to Standridge and that Standridge would smooth the issues over with the state regulators. After the meeting, TTC wired $1.8 million dollars for the March premium. Around this time Standridge merged Global Health into EOS Health, a new

company. In an apparent attempt to limit his liability for unpaid claims, Standridge requested that the EOS employees be "hired" by Stat-Care, a third party administrator controlled by Touchet, although EOS would continue to supervise them.

The problems continued and in May 2001, TTC again refused to pay the monthly premium because claims had not been paid. After badgering by Brown, TTC paid the premium, but it did not cover all the claims and by June 2001 unpaid workers' compensation claims exceeded $10 million. Standridge claimed to have no money to pay the claims—much of the money given by TTC to Brown and Standridge had been used to pay the operating expenses and salaries of Brown, Touchet, and Standridge, and for non-TTC investments by Standridge and Brown. The money left was woefully insufficient. Finally, in July 2001, Florida issued a stop-work order to TTC for failure to have legitimate workers' compensation insurance. TTC's clients demanded payment on the existing claims and information on how to contact Regency. Touchet and Brown provided EOS employees with the address of an expired post office box to give to the angry claimants and EOS employees told the claimants that the failure to pay claims was the fault of TTC.

Undeterred by the failure of their efforts with TTC, Standridge, Touchet, and Brown sought to capture TTC's former clients by starting a PEO of their own. In August 2001, they purchased a shell company and formed MRIK. Standridge was

made a fifty-one percent shareholder as he had recently passed a background check and could be licensed by the state in the shortest time. They hired Lawrence Jones, the former manager of TTC's Tampa office, to manage MRIK. Once again, Touchet, Brown, and Standridge without success sought valid workers' compensation insurance. They then turned again to Regency as a "temporary" fix. As with TTC, Touchet provided certificates of insurance that failed to disclose to the client companies that Regency was nonadmitted. Jones questioned whether Regency was admitted but Standridge ordered him to use the provided certificates of insurance. Similar results followed. Florida issued MRIK a stop-work order in July 2002.

Realizing that Regency no longer offered cover, Brewer, Touchet, and Brown formed another insurance company, grandiosely named TransPacific International Insurance Company Limited. TransPacific was originally incorporated in New Zealand, though in an effort to license the company in the U.S. Standridge unsuccessfully attempted to move its domicile to Arkansas. It lacked reserves, had no employees, and had no office inside the United States. Like Regency, it was just paper.

With the stop-work order for its use of Regency, MRIK switched to TransPacific. Once again, Touchet, through Stat-Care, issued certificates of insurance to MRIK stating MRIK had valid workers' compensation insurance for

MRIK's clients. Jones testified he objected to the use of a nonadmitted carrier, but the state authorities permitted MRIK to operate while TransPacific's validity was verified. In August 2002, Florida again issued a stop-work order.

In addition to forming their own PEO, Brown, Touchet and Standridge recruited other PEO clients facing problems with their workers' compensation insurance similar to those of TTC. The pattern was consistent. From 2001 to 2004, Brown, Touchet, and Standridge continued to sell Regency and TransPacific policies through various PEOs desperate for workers' compensation coverage. Touchet wrote the workers' compensation insurance policies disclosing Regency and Transpacific were nonadmitted. He also crafted certificates of insurance that did not reveal the status of Regency and TransPacific for the PEOs to provide to their clients. Standridge acted as administrator for many of the PEOs. As the money ran out, he and his employees developed scripts in order to mollify angry claimants and inquiring regulators. Many of these PEOs even continued to use Regency and TransPacific in some states after regulators in other states issued stop-work orders.

In 2004 investigators closed in and the house of cards collapsed. Several indicted coconspirators pled guilty, including Brown and the CEOs of several of the PEOs. Brown, Jones, and other conspirators testified at trial against Touchet and Standridge, detailing the scheme. The government also presented the testimony of

Lynn Szymoniak, an expert on the workers' compensation industry, who testified that the licensing and regulatory requirements Touchet and Standridge violated were well known by those in the workers' compensation industry. The government also presented Touchet's grand jury testimony, as well as the testimony of employees of third party administrators and PEOs, and some of Touchet's and Standridge's victims. The government corroborated the testimony with detailed financial records and emails.

### III

Both Touchet and Standridge argue the district court erred in admitting the expert testimony of Lynn Szymoniak regarding information generally known by third party administrators and persons who own and operate PEOs. We review a district court's determination that a witness is a qualified expert for abuse of discretion.[6] "Under Rule 702, a district court must determine that proffered expert testimony is both reliable and relevant. . . . For non-scientific expert testimony, the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. A district court may

---

[6] *American Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1339 (11th Cir. 2009).

10

decide that non-scientific expert testimony is reliable based upon personal knowledge or experience."[7]

Szymoniak testified to, among other things, the substantive requirements of state workers' compensation law and the general knowledge in the industry of those requirements. The court found Szymoniak to be qualified based on extensive testimony as to her background: Szymoniak had a law degree from Villanova, taught clinical programs and employment discrimination, worked for three years for the National Council on Compensation Insurance—the rate-making organization for the workers' compensation industry, was the editor of a legal magazine which published reviews of significant changes in workers' compensation in the fifty states, was a member, and at one point head, of the ABA tort insurance practice section, workers' compensation section, was a partner of a firm and head of the practice group specializing in workers' compensation fraud and currently has her own firm doing similar work, published eleven articles and edits an online magazine, Fraud Digest, was a founding member of the Florida Task Force on workers' compensation, and lastly was involved in the rule making process concerning PEOs and workers' compensation as well as third party administrators.

---

[7] *Id.*

11

Szymoniak testified on the basis of this experience and conversations over her career with workers' compensation professionals. Relying on *United States v. Scrima*, Touchet and Standridge claim the testimony was hearsay.[8] In *Scrima*, the court stated "[a]lthough experts are sometimes allowed to refer to hearsay evidence as a basis for their testimony, such hearsay must be the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject."[9] But in *Scrima* the expert testimony was by an accountant who based his conclusions on calculations of net worth on "statements to casual business acquaintances."[10] The court found qualified expert accountants would not use such evidence. This contrasts with *United States v. Steed*, allowing a police officer to testify regarding standard police tactics at traffic stops based on "discussions [the officer] had with other law enforcement officers over the course of his career, and literature with respect to trends in drug trafficking."[11] As in *Steed*, Szymoniak

---

[8] Touchet and Standridge also seek to exclude the testimony on the grounds that it constitutes an informal survey which fails the scientific method. However, "[w]here experience-based studies are generally accepted in the industry, a court cannot penalize a litigant for the lack of scientific or academic studies and public reports on the topic. . . . ." *United States v. Frazier*, 387 F.3d 1244, 1299–1300 (11th Cir. 2004) (internal quotations and citations omitted)).

[9] 819 F.2d 996, 1002 (11th Cir. 1987).

[10] *Id.*

[11] *Id.* at 965.

12

testified regarding general practice in a field—third party administrators' knowledge of appropriate and legitimate business practices. This was testimony by the witness about her work and her familiarity with the regulatory environment. It was evidence in support of her competence to express an opinion regarding the awareness of certain industry requirements—that knowledge of these requirements was essential to persons in this field. It was not an effort to prove what the regulations were from the statements of others. Knowledge of an industry's business practices—unlike technical accounting valuations—is gleaned from years of working within the industry and with its professionals. It is not a recounting of out of court statements of others. We find no abuse of discretion by the district court in admitting Szymoniak's testimony.

IV

Touchet argues that the court erred in denying a mistrial on the ground that Brown made reference before the jury of civil litigation in which he and Touchet were currently involved. The decision not to grant a mistrial is reviewed for abuse of discretion.[12] Touchet must demonstrate that his substantial rights are prejudicially affected. That is, when there is a reasonable probability that, but for the remarks, the

---

[12] *United States v. Emmanuel*, 565 F.3d 1324, 1334 (11th Cir. 2009).

outcome of the trial would have been different.[13] "[W]here the comment is brief, unelicited, and unresponsive, adding nothing to the government's case, the denial of a mistrial is proper."[14]

The contested testimony is as follows:

Q: Is there one of those three [Touchet, Standridge or Jennings], though, that you consider a friend?
A: I do.
Q: Which one?
A: Don Touchet.
Q: Why?
A: We've known each other the longest; been involved in a lot of problems; working through problems; we've been sued multiple times; we continue with—I believe we're still actively involved in three civil litigation—

At this point the defense objected and the prosecution agreed not to pursue the line of questioning.

This case fits squarely within *United States v. Emmanuel*. There the court found a government witness's fleeting, unsolicited, reference that the defendant had been out on bail insufficient grounds for a mistrial.[15] Here, the testimony was arguably less prejudicial than that in *Emmanuel*. Civil litigation is a common occurrence. No details of the litigation were disclosed and the government did not pursue the matter.

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

14

Moreover, the court offered to provide a curative instruction to the jury, but Touchet declined. In light of the substantial evidence to convict Touchet, the minor significance of Brown's comments, and Touchet's refusal of an instruction, the denial of a mistrial was proper and was not an abuse of discretion.

V

Standridge argues there was insufficient evidence to convict him of any charge. There are two sets of charges: (1) counts one through six and seventeen through nineteen charged Standridge with mail and wire fraud and conspiracy for his participation in the sale of Regency and TransPacific insurance through his PEO MRIK and to various other PEOs; and (2) counts twenty and twenty-one charged Standridge with money laundering. Standridge argues that, with respect to the fraud and conspiracy counts, the government failed to prove he knew the use of Regency and TransPacific was illegal and that he believed the use of Regency and TransPacific was acceptable in limited instances. With respect to the money laundering counts, Standridge argues the government failed to prove the property involved was "profits" from unlawful activity as required by the Supreme Court's decision in *United States v. Santos*. We review a challenge to the sufficiency of the evidence de novo, viewing

15

the evidence "in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor."[16]

A

We first turn to the fraud and conspiracy counts. Conviction under the mail and wire fraud statutes requires proof that Standridge intentionally participated in a scheme to defraud and used the mails or wire communications to further the scheme.[17] Either may be proved through circumstantial evidence.[18] Conspiracy demands proof of: "(1) . . . an agreement to achieve an unlawful objective; (2) . . . knowing and voluntary participation in the agreement; and (3) . . . an act in furtherance of the agreement."[19] The government argues that Standridge participated in the scheme to defraud by his participation in his PEO MRIK and through acting as a third party administrator for other PEOs using Regency and TransPacific. Standridge's defense is, in short, that he was unaware of the fraudulent nature of the business: He maintains that at no point did he know of the illegality of the use of Regency or take

---

[16] *United States v. Ortiz*, 318 F.3d 1030, 1036 (11th Cir. 2003) (internal quotation marks omitted).

[17] 18 U.S.C. §§ 1341 & 1343; *United States v. Brown*, 40 F.3d 1218, 1221 (11th Cir. 1994). Standridge was also charged under the aiding and abetting statute. 18 U.S.C. § 2.

[18] *United States v. Robertson*, 493 F.3d 1322, 1330–31 (11th Cir. 2007).

[19] *United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998); 18 U.S.C. § 371.

16

part in the use of Regency as a workers' compensation insurance carrier and that the government failed to present sufficient evidence to prove otherwise.

Standridge's defense is essentially his word over that of his confederates—a credibility call belonging to the jury. Brown testified that Standridge was aware of the illegality of Regency at least by the April 12, 2001 meeting with TTC. Standridge stood to make money acting as the administrator for TTC and he had a strong interest in maintaining the business relationship with TTC. The testimony indicated that Standridge assisted in convincing TTC to agree to the use of Regency. Brown testified that Standridge knew of the contents of the policy and of the discrepancies in the certificates of insurance (between that provided to TTC and that provided to TTC's client companies). In addition, though Standridge knew other administrators would not work with Regency, Standridge asserted he could smooth out any problems with regulators arising from the use of Regency—implying he would be able to prevent sanctions through the use of his personal contacts at the various agencies. Both Brown and the CEO of TTC testified Standridge was integral to resolving the problems between Brown and TTC to keep the scheme alive.

Moreover, evidence at trial revealed Standridge's involvement continued significantly past any point where he could convincingly claim ignorance. There was testimony that Standridge asked to structure EOS so that its employees were

17

technically employed by Touchet's Stat-Care in an attempt to limit his liability arising from the use of Regency. But even after the restructuring, Standridge was intimately involved in its business—and knew his employees were using a script to mislead regulators as the scheme with TTC began to unravel. Even after TTC received a stop-work order, Standridge continued to act as the administrator for other PEOs using Regency and TransPacific. Lastly, there was testimony that Standridge was involved in diverting some of the PEOs' premium dollars to unauthorized purposes.

The government also provided sufficient evidence to convict Standridge of fraud for his participation in MRIK. Standridge argues he believed MRIK would not be providing workers' compensation insurance—but rather only health insurance—and that Lawrence Jones went behind his back to fraudulently provide Regency and TransPacific insurance to MRIK's client companies. The government countered with evidence that Standridge was a knowing and willing participant in the scheme: Standridge owned fifty-one percent of MRIK's stock and was its controlling person and as Brown's testimony made clear, he and Standridge established MRIK to absorb TTC's former clients. While he stated the original plan was not to use Regency, the conspirators quickly turned to Regency when other options fell through—even after its use had doomed TTC. Jones also testified extensively against Standridge. He stated that Standridge was his immediate boss and that Standridge

18

instructed him to use the misleading certificates of insurance identifying Regency and TransPacific as the clients' workers' compensation carrier. Both Jones and Brown testified Standridge was aware of Regency's and TransPacific's nonadmitted status and that Standridge said he would take care of the licensing issues raised by the states. Brown and Jones's testimony evidenced a fraud in which Standridge was intimately involved. The evidence was sufficient to uphold the convictions.

B

Standridge argues that the convictions for money laundering must be overturned under *United States v. Santos*, as the government cannot prove the money at issue was the profits of illegal activity as opposed to receipts. Money laundering requires proof that the defendant conducted or attempted to conduct a financial transaction, knew the property involved in the transaction represented the proceeds of unlawful activity, the property involved was in fact the proceeds of the specified unlawful activity, and the defendant conducted the financial transaction with the intent to promote the carrying on of the specified unlawful activity.[20] In *Santos*, the Supreme Court in a plurality opinion held that in the context of gambling proceeds,

---

[20] *United States v. Williamson*, 339 F.3d 1295, 1301 (11th Cir. 2003).

19

proceeds meant "profits" as opposed to "receipts."[21]  As this objection was not raised at trial, we review for plain error.[22]

This court recently addressed the *Santos* opinion in *United States v. Demarest*:[23]

> *Santos* has limited precedential value.  Three parts of Justice Scalia's four-part opinion are for a plurality of justices, and those parts do not state a rule for this case.  When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.  The narrow holding in *Santos*, at most, was that the gross receipts of an unlicensed gambling operation were not 'proceeds' under section 1956.[24]

This court therefore treats Justice Stevens's opinion as controlling in its narrowest form.  As in *Demarest*, here the money laundering charges did not involve receipts from an unlicensed gambling operation.  This court has previously defined proceeds as "what is produced by or derived from something . . . by way of total revenue; the

---

[21] 128 S.Ct. at 2034 (Stevens, J., concurring).

[22] *United States v. Cotton*, 535 U.S. 625, 628–31 (2002); *United States v. Demarest*, 570 F.3d 1232, 1241 (11th Cir. 2009).

[23] 570 F.3d 1232.

[24] *Id.* at 1242 (internal quotations and citations omitted).  Justice Stevens, in his concurrence, stated "this Court need not pick a single definition of 'proceeds' applicable to every unlawful activity, no matter how incongruous some applications may be."  *Santos*, 128 S.Ct. at 2031 (Stevens, J., concurring).

total amount brought in."[25]  This definition includes receipts as well as profits.  This definition binds the court, and therefore there was no error—certainly no plain error—in the refusal to grant a judgment of acquittal on this point.

VI

Touchet argues that the district court erred in failing over objection to instruct the jury that in order to convict him of mail or wire fraud it must find that the scheme and artifice was "reasonably calculated to deceive persons of ordinary prudence and comprehension."  Touchet relies on the court's decision in *United States v. Brown*.[26]  *Brown* was overruled by the court's en banc opinion in *United States v. Svete*, explaining that "we overrule our holding in *Brown* that the offense of mail fraud requires proof of a scheme calculated to deceive a person of ordinary prudence."[27]  Touchet's argument is foreclosed.

---

[25] *United States v. Silvestri*, 409 F.3d 1311, 1333 (11th Cir. 2005) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1807 (3d ed 1961)); *United States v. Khanani*, 502 F.3d 1281, 1297 n.6 (11th Cir. 2007).

[26]  79 F.3d 1550, 1557 (11th Cir. 1996) ("[I]n this circuit . . . the government must show the defendant intended to create a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension." (internal quotations and citations removed)) *revs'd by United States v. Svete*, 556 F.3d 1157 (11th Cir. 2009) (en banc).

[27] *Svete*, 556 F.3d at 1167.

# VII

Touchet argues that his sentence was procedurally and substantively unreasonable. At sentencing, the court adopted the factual findings of the presentence investigation report, finding a guidelines range of 360 months to a statutory maximum of 215 years' imprisonment. The district court departed downwards and sentenced Touchet to 264 months' imprisonment. Touchet argues (1) he did not qualify for a three level enhancement as a "manager or supervisor"; (2) he did not qualify for a two level enhancement for obstruction of justice; (3) he did not qualify for a two level enhancement for sophisticated means; and (4) the sentence was substantively unreasonable as the court did not properly address the section 3553 factors. We address each in turn.

## 1

The district court applied a three level enhancement after finding Touchet qualified as a manager or supervisor. "This court reviews a sentencing court's determination of a defendant's role in the crime for clear error." Section 3B1.1 of the Sentencing Guidelines provides for a three level enhancement "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity

involved five or more participants or was otherwise extensive."[28] We evaluate several factors in our determination:

> (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.[29]

It is clear that control over assets alone is insufficient, the individual must have had control over at least one other participant in the criminal activity.[30]

Touchet was situated near the top of the hierarchy of the overall scheme. He was the business partner of Thomas Brown and was the connection to Jerry Brewer, the owner of Regency. Touchet participated in the negotiations with the PEOs, including at the April 12th meeting with TTC in which the fraud was developed, and subsequently issued the policies and misleading certificates of insurance to the PEOs to pass along to their clients. Moreover, as the owner of TransPacific and State-Care, he influenced the other coconspirators, including EOS Health, which used the Stat-Care employees, and the PEOs, which used the certificates of insurance that he

---

[28] U.S.S.G. § 3B1.1(b).

[29] *United States v. Gupta*, 463 F.3d 1182, 1198 (quoting U.S.S.G. § 3B1.1, comment (n.4)).

[30] *United States v. Glover*, 179 F.3d 1300, 1302–03 (11th Cir. 1999).

23

produced. Based on Touchet's extensive involvement in the development and operation of the scheme, the court did not clearly err.

2

The district court also applied a two level enhancement for obstruction of justice. The court reviews a district court's determination that a defendant obstructed justice for clear error when credibility is at issue.[31] Under Sentencing Guidelines section 3C1.1 a district court may impose a two level enhancement if it finds that the defendant obstructed justice, including committing perjury on a material matter at his own trial.[32] Touchet's trial testimony directly contradicted his grand jury testimony on a material matter: While he testified at the grand jury that he knew what he was doing was illegal, he later testified he only found out what he was doing was illegal after the fact and that the prosecutor had influenced him to falsely admit criminal activity. There was no clear error.

3

---

[31] *United States v. Banks*, 347 F.3d 1266, 1269 (11th Cir. 2003).

[32] *United States v. Dunnigan*, 507 U.S. 87, 88–89 (1993).

Touchet next objects to the district court's determination that he is subject to a two level increase because his fraud deployed sophisticated means, a determination we review for clear error.[33] The commentary to section 2B1.1(b)(9)(C) states "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."[34] Here the fraud revolved around Regency and TransPacific, shell corporations which Touchet and the others used to issue illegitimate workers' compensation insurance. In addition, by using EOS and Stat-Care as third party administrators to shield Regency and TransPacific from claimants and regulators, and by submitting misleading certificates of insurance to the PEOs to provide to their clients, they attempted to hide the illegality of their actions. There was no clear error.

4

Lastly, Touchet argues that the district court failed to properly address the section 3553 factors by not considering that he is fifty-four years old, has adopted

---

[33] *United States v. Clarke*, 562 F.3d 1158, 1165 (11th Cir. 2009).

[34] U.S.S.G. § 2B1.1 comment (n.8(b)).

25

children, some of whom were abused and abandoned, has a history of service to the church and Boy Scouts, has been a good friend, and has no prior criminal record. In addition, the court received over eighty letters on his behalf. This court has stated:

> Under *Gall*, we must engage in a two-step process of sentencing review. First, we must ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range. Second, we must consider the substantive reasonableness of the sentence imposed, under an abuse-of-discretion standard, taking into account the totality of the circumstances.[35]

First, the sentence is procedurally reasonable as the court clearly articulated the section 3553 factors, noted the guidelines were advisory and articulated its reasons for imposing the sentence. Second, the sentence is substantively reasonable. Touchet highlights mitigating factors, but the district court departed downward from the recommended guidelines range while emphasizing the fact that Touchet had defrauded thousands of individuals of workers' compensation coverage.

VIII

---

[35] *United States v. Livesay*, 525 F.3d 1081, 1091 (11th Cir. 2008).

Standridge also argues that his sentence was unreasonable. The court adopted the factual findings set forth in the presentence investigation report, finding that Standridge's guideline range was 292 to 365 months' imprisonment. The court departed downward and sentenced Standridge to 216 months' imprisonment. The sentence is procedurally reasonable as the court clearly articulated the section 3553 factors, noted the guidelines were advisory and articulated its reasons for imposing the sentence. Standridge argues that the sentence is not substantively reasonable as he was a first offender and lived an exemplary life including providing pro bono medical care. Standridge also argues that the district court focused too heavily on one factor—that Standridge refused to cooperate.[36] We do not find these arguments persuasive. The district court emphasized Standridge defrauded his victims of their rightful benefits out of sheer greed and in doing so caused great suffering. We find no clear error.

IX

---

[36] *United States v. Crisp*, 454 F.3d 1285, 1292 (11th Cir. 2006) ("a district court's 'unjustified reliance upon any one [§ 3553(a)] factor is a symptom of an unreasonable sentence.'").

At the able hand of a federal district judge and facing a jury of twelve, these defendants received the fair trial they were due.  We find no error.  The judgments of conviction and sentences are AFFIRMED.