[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-10992

_____

D.C. Docket No. 9:07-cr-80138-KAM-2

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 6, 2012
JOHN LEY
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANK SARCONA,
a.k.a. Frank Sarcone,
a.k.a. Dave Johnson,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 6, 2012)

Before EDMONDSON, MARTIN, and SUHRHEINRICH,* Circuit Judges.

_____

* Honorable Richard Suhrheinrich, United States Circuit Judge for the Sixth Circuit,
sitting by designation.

MARTIN, Circuit Judge:

A jury convicted Frank Sarcona of twenty-nine counts of a sixty-two-count indictment charging fraud and other criminal acts arising from Mr. Sarcona's operation of the "LipoBan Clinic." The LipoBan Clinic, a direct mail-order business, employed a variety of deceptive practices to market and sell the weight-loss product "LipoBan Dietary Supplement."

Mr. Sarcona appeals his conviction on all counts, arguing that: (1) the injunction which was the predicate for his criminal contempt convictions was invalid; (2) there was insufficient evidence to support his misbranding convictions in light of the statute's ambiguity; (3) the First Amendment requires reversing his fraud convictions; (4) his money-laundering convictions are invalid under recent Supreme Court jurisprudence; and (5) the District Court improperly admitted expert testimony. After oral argument and careful review of the briefs and the record, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

### A.

On January 27, 1997, the Federal Trade Commission ("FTC") filed a complaint in the Southern District of Florida against Mr. Sarcona and the company

that he co-founded, SlimAmerica, Inc. The complaint alleged that the defendants engaged in deceptive practices in the advertising and sale of a weight loss product called "Super-Formula." These deceptive practices included advertising scientifically unsupported claims about achieving dramatic weight loss within brief periods of time without dieting or exercise, as well as false representations of medical endorsement.

This was not the first scheme for which Mr. Sarcona was accused of using fraud and deception to market a consumer product. Three similar schemes preceded SlimAmerica. The first was "Forever Thin," which promised users permanent weight losses of up to six pounds in the first forty-eight hours and up to twelve pounds every two weeks thereafter. This scheme ended in 1985 in response to proceedings initiated by the U.S. Postal Service and the State of Utah. A second weight-loss scheme was "Amerdream," which sold a product called "The Ultimate Solution Diet Program." Promotional materials for that program claimed: "After the first week, some individuals will see losses of up to 35 pounds . . . an extremely overweight person could easily drop 40, 65, even 100 pounds or more." The materials further stated that any participant who made the program's minimum purchase for $129.95 would receive a $1,000 U.S. Treasury bond. Four states enjoined Mr. Sarcona's marketing practices and claims. By 1991 this

scheme had also come to an end.

In the third scheme preceding SlimAmerica, Mr. Sarcona led the company Advanced Automotive Technologies ("AAT") and telemarketed the "PetroMizer," which was described as a fuel saving and emission control device for automobiles. Six states obtained injunctions or money judgments based on AAT's allegedly fraudulent misrepresentations. In addition, Mr. Sarcona signed a settlement agreement with the U.S. Postal Service. Ultimately, in response to a FTC complaint filed against Mr. Sarcona, Amerdream, and AAT, the U.S. District Court for the District of Arizona entered a permanent injunction in 1991 enjoining Mr. Sarcona from making false statements with respect to the future marketing of "any diet product, program, or service." The Court also ordered Mr. Sarcona and AAT to pay $622,634 in consumer redress.

It was against this background that the FTC succeeded in obtaining a broad preliminary injunction on July 2, 1997 to address Mr. Sarcona's then-recent SlimAmerica scheme. One of the most far-reaching terms of the injunction entered by the U.S. District Court of the Southern District of Florida prohibited Mr. Sarcona from engaging in a range of business practices, including making any statement or representation that a product would cause weight loss or a reduction in body size. The preliminary injunction also required Mr. Sarcona to obtain a $1

4

million performance bond before engaging "in the advertising, marketing, or sale of any program, service or product" relating to weight loss or control. The injunction further specified a number of terms and conditions for bond. The bond had to be issued by a surety company (1) admitted to do business in each state in which Mr. Sarcona was to do business and that (2) held a Federal Certificate of Authority As Acceptable Surety On Federal Bond and Reinsuring. The bond had to be issued in favor of the FTC for the benefit of any victims injured as a result of Mr. Sarcona's violation of the preliminary injunction. The bond had to remain in full force while Mr. Sarcona engaged in the restricted conduct, and for at least the following three years. And at least ten days before undertaking any restricted conduct, Mr. Sarcona had to provide written notice and proof of the bond to the FTC.

Two years later, on June 30, 1999, the U.S. District Court for the Southern District of Florida entered a permanent injunction. After making a number of findings of fact and conclusions of law, the Court ordered that "the preliminary injunction entered in this cause on July 2, 1997 is hereby made permanent." It further ordered Mr. Sarcona to "post a performance bond in the amount of $5 million before engaging, directly or indirectly, in any business related to weight-loss products or services specifically, or in marketing of any product or services

5

generally, anywhere in the United States." Mr. Sarcona appealed, and in both a motion to stay the permanent injunction and in his appellate brief, argued that the injunction's $5 million-dollar bond requirement was excessively burdensome. This Court denied Mr. Sarcona's stay request and later dismissed his appeal for failure to prosecute.

Apparently, the influence of even this drastic permanent injunction on Mr. Sarcona's conduct turned out to be quite limited. Starting from late 1999 or early 2000, only months after the issuance of the permanent injunction, Mr. Sarcona formed and ran a company with several associates called the LipoBan Clinic, Inc. It marketed and sold a weight-loss product called "LipoBan." LipoBan's main ingredient was chitosan, a shellfish-based product that purports to limit the body's absorption of lipids or fat. LipoBan was marketed to consumers through direct mail solicitations, newspapers advertisements, and the Internet. Mr. Sarcona wrote and organized the promotional materials, which were sent as a package to potential customers by first-class mail. The package materials included (1) a letter from "Joseph Maya, M.D." that offered customers an opportunity to participate in a weight-loss study with a new product that would enable them to lose large amounts of weight quickly without changing their diet or exercise habits; (2) a LipoBan order form whose flip side contained a "LipoBan Test Participant

6

Survey"; (3) newspaper-like advertisements bearing "before" and "after" photographs and testimonials; (4) a business card from "Joseph Maya, M.D.," identifying him as the LipoBan Clinic's medical director and George Forgione as the clinic director; and (5) a return envelope pre-addressed to the attention of "Dr's. Maya and Forgione" at "The LipoBan Clinic, Inc." Those who ordered LipoBan by submitting the "Test Participant Survey" then received the product by mail.

All of the materials in the promotional package contained highly misleading, if not patently false, representations. First, "Joseph Maya, M.D." was a fiction. The LipoBan Clinic paid Jose Maya Behar, a Mexican doctor who was not licensed to practice in the United States and had never even visited the LipoBan Clinic, for use of his name (or one closely resembling it) in connection with the sale of LipoBan. Directly contrary to the claims in the LipoBan literature and on the website, Dr. Maya Behar had never conducted studies with LipoBan. Beyond that, George Forgione was an unlicensed chiropractor, and the LipoBan Clinic lacked the most basic characteristics of a medical clinic, such as areas for interviewing, diagnosing, studying, or treating patients.

Second, the weight-loss study that the LipoBan Clinic and its "team of researchers" purported to be conducting was a fiction. There was no such study.

7

Instead, the LipoBan Clinic was simply collecting data from customers who reported large weight losses. None of the LipoBan Clinic employees were trained weight-loss, nutrition, or medical professionals.

Finally, some of the testimonials in the promotional package were false. For example, one stated: "Jerry Brown, a Ph.d, [sic] . . . found that by simply blocking the fat causing calories in his food, he was able to lose 120 pounds in just 90 days." In fact, Dr. Brown testified that he lost that weight by, in addition to taking LipoBan, bicycling up to 100 miles a week and severely restricting his caloric and fat intakes. He also testified that he never gave the LipoBan Clinic permission to make that representation on his behalf.

The LipoBan Clinic operated for approximately four years and generated over $16 million in revenue. During this time, Mr. Sarcona received more profits from LipoBan sales than anyone else and made virtually all decisions regarding LipoBan's sales and marketing. Apparently in light of the prohibitions and mandates of the permanent injunction entered against him, Mr. Sarcona made great effort to conceal his involvement with the LipoBan Clinic. Mr. Sarcona's name did not appear in any official records or registrations for LipoBan or the LipoBan Clinic. In dealing with vendors on behalf of the company, he generally referred to himself as "Dave Johnson." If anyone called for Mr. Sarcona, the

company's employees were supposed to respond that they did not know him. And Mr. Sarcona never received payment directly from the LipoBan Clinic. Instead, he received payment via checks that were deposited into an account of a defunct corporation that was opened with a non-existent tax identification number. Mr. Sarcona used these funds to pay for his personal living expenses and deposited some of them into a friend's account for purposes of paying expenses on a Virgin Islands home he had purchased in the name of another friend.

Cognizant of the permanent injunction's performance bond requirement, Mr. Sarcona claimed a friend in the Bahamas tried to satisfy the requirement on his behalf. However, at no time did Mr. Sarcona obtain or post a bond in favor of the FTC that remotely satisfied the conditions specified in the text of the preliminary injunction. Nor did Mr. Sarcona ever attempt to ask for clarification regarding how to post the bond properly.

B.

In 2007, a federal grand jury in the Southern District of Florida returned a sixty-two-count superseding indictment against Mr. Sarcona and a co-defendant, George Forgione, related to their operation of the LipoBan Clinic. After a jury trial, Mr. Sarcona was convicted of: one count of conspiracy to commit mail fraud, wire fraud, and criminal contempt (Count 1); eight counts of mail fraud (Counts 2,

9

3, 6, 14, 16, 20, 22, and 25); two counts of wire fraud (Counts 27 and 29); one count of conspiracy to commit money laundering (Count 30); eight counts of promotion money laundering (Counts 31–38); four counts of money laundering transactions over $10,000 (Counts 42, 43, 47, and 48); three counts of causing misbranded food to be introduced into interstate commerce (Counts 50, 53, and 59); and two counts of criminal contempt (Counts 60 and 62). He was sentenced to a total of 240 months in prison and filed a timely notice of appeal in March 2010. On appeal, he challenges only his convictions.

## II. DISCUSSION

### A.

Mr. Sarcona insists that his criminal contempt convictions (Counts 60 and 62) should be reversed because the superseding indictment failed to state an offense. No offense was stated, Mr. Sarcona claims, because the permanent injunction was invalid in two ways. First, the injunction failed to comply with the requirement specified by Federal Rule of Civil Procedure 65(d) that injunctions "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). Contrary to this mandate, the permanent injunction that Mr. Sarcona was

10

convicted of knowingly violating said simply that it was making permanent the detailed preliminary injunction already issued. According to Mr. Sarcona, this rendered the permanent injunction invalid. Second, by modifying the amount of the bond requirement from the preliminary injunction, the permanent injunction conflicted with the preliminary injunction, resulting in ambiguity that should make the bond requirement unenforceable. Since the primary issue here is whether the district court properly applied the legal requirements of Rule 65, we review the matter de novo. Mega Life and Health Ins. Co. v. Pieniozek, 585 F.3d 1399, 1403 (11th Cir. 2009).

Mr. Sarcona is correct that the permanent injunction failed to comply with the precise terms of Rule 65(d). However, "while the preference is to enforce the requirements of Rule 65(d) 'scrupulously,' failure to abide by the precise terms of the Rule does not compel finding the judgment below void." Combs v. Ryan's Coal Co., Inc., 785 F.2d 970, 978 (11th Cir. 1986) (citation omitted). Indeed, we have previously said that "[a] court may . . . disregard the defect if it is clear from the totality of the language in the various documents that the contemnors understood their obligations under the injunction." Id.; accord United States v. Goehring, 742 F.2d 1323, 1324 (11th Cir. 1984); cf. Chathas v. Local 134 IBEW, 233 F.3d 508, 513 (7th Cir. 2000) ("When the terms of an injunction, although not

11

set forth in a separate document as the rule requires, can be inferred from the documentary record with sufficient clarity to enable a violation of those terms to be punished as a contempt, the injunction is enforceable."). In Combs we further described the factors for assessing the validity of an injunction in the contempt context. These factors are whether the obligations were "intelligible" to the contemnor and "capable of enforcement," and whether the contemnor understood those obligations. 785 F.2d at 978–79.

We see no issue with respect to the acts to be restrained by the permanent injunction. The terms of the preliminary injunction were clear and enforceable. Mr. Sarcona was prohibited from making any statement or representation that a product would cause weight loss or reduction in body size, could not claim a product had been validated by scientific studies, and had to post a $1 million bond before engaging in a business having to do with dieting or weight control. Indeed, the government presented evidence that Mr. Sarcona understood these obligations well. When the preliminary injunction was then made permanent through unequivocal language, it is difficult to see how these terms became less intelligible or capable of enforcement.

But Mr. Sarcona argues the bond requirements for the permanent injunction are a different matter. Specifically, when the amount of the performance bond

increased between the preliminary and permanent injunctions, it became unclear to him whether he should pay the amount specified by the preliminary injunction, the amount specified by the permanent injunction, or both. He also claims not to know whether, in addition to the amount of the bond, the type of bond and method of posting it had changed. Neither of these arguments is persuasive.

Setting aside for now the objective clarity of the language in the permanent injunction, we note that on at least two separate occasions Mr. Sarcona indicated his understanding of the $5 million performance bond obligation. In his August 12, 1999 Motion for Stay Pending Review and Request for Expedited Ruling, Mr. Sarcona stated that the "Final Judgment for Permanent Injunction and Damages" "called for a five million dollar performance bond as condition to Defendant conducting business in his life long profession of marketing." Furthermore, in an October 12, 1999 brief appealing the final judgment, Mr. Sarcona wrote that "the government imposed a five million-dollar performance bond requirement on" him. Thus, Mr. Sarcona demonstrated a clear understanding of his $5 million performance bond obligation.

Also, in light of his clear cognizance of the performance bond obligation, we are simply unpersuaded by Mr. Sarcona's argument that he believed the method for paying the bond might have somehow changed. If Mr. Sarcona had

13

questions about how exactly to post his $5 million bond in a valid way, he could have easily asked. But there is no record of him doing so. Moreover, even if Mr. Sarcona's story about trying to post the bond were believed, it hardly demonstrates a good-faith compliance effort that fell short only because Mr. Sarcona was not quite sure how to post the bond properly. Indeed, little about his version of events evidences genuine intention on the part of Mr. Sarcona to comply with the bond requirement.

It is true that the District Court should have scrupulously adhered to Rule 65(d). But both because Sarcona's obligations were intelligible and capable of enforcement and because we have every reason to think he understood those obligations, the permanent injunction underlying Sarcona's contempt convictions was not invalid. Consequently, we affirm the convictions.

B.

Mr. Sarcona argues that there was insufficient evidence to support his misbranding convictions (Counts 50, 53, and 59). Specifically, he asserts that the language of the statute under which he was convicted, the Federal Food, Drug, and Cosmetic Act ("FDCA"), is ambiguous, lending itself to different interpretations. Under a couple of these statutory interpretations, he claims, the evidence simply did not support conviction.

14

To support this argument, Mr. Sarcona points to two ambiguities in particular. The first ambiguity concerns the scope of the definition of "labeling." Section 343(a)(1) of the FDCA deems a food, such as LipoBan, to be "misbranded" if "its labeling is false or misleading in any particular." 21 U.S.C. § 343(a)(1). "Labeling" is specifically defined as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m). Mr. Sarcona contends that, as a matter of law, it is doubtful whether the LipoBan promotional materials he helped author and distribute qualified as "labeling." Because the materials were mailed separately from the actual LipoBan products, they clearly were neither located on "any article or any of its containers or wrappers" nor "accompanying such article." Instead, he asserts, as materials intended to advertise LipoBan and attract customers, they simply constituted ordinary promotional advertising that fell outside the reach of § 343(a)(1). And if this is right, then as a matter of law Mr. Sarcona could not have been convicted of violating the statute.

The second ambiguity Mr. Sarcona points to concerns whether § 343(a)(1) prohibits misbranding on the "labeling" or, instead, just on the "label." Under the FDCA, these terms are distinct. "Label" refers only to "a display of written,

15

printed, or graphic matter <u>upon the immediate container</u> of any article." 21 U.S.C. § 321(k) (emphasis added). In contrast, as explained above, "labeling" encompasses a broader universe of materials, including any printed matter "accompanying" the product. Mr. Sarcona says the ambiguity in the statute supposedly arises because, on the one hand, the text of the body of the statutory provision refers specifically to "labeling," while, on the other hand, the heading or title of the provision refers only to "[f]alse or misleading label." 21 U.S.C. § 343(a). According to Mr. Sarcona, the heading of § 343(a) thus suggests that the provision has a narrower scope than the body indicates. And if the statute only prohibited misbranding on the "label," then, for this reason as well, the evidence would fail to support Mr. Sarcona's conviction under § 343(a)(1).

At the very least, Mr. Sarcona insists, the statute is ambiguous in these two ways. He argues that in the criminal context such ambiguity demands that we apply the rule of lenity, under which we interpret the statute narrowly and in favor of the defendant. He says that if we do so, the evidence will no longer be sufficient to support his misbranding convictions.

We review both questions of statutory interpretation and challenges to the sufficiency of evidence <u>de novo</u>, viewing the evidence in the light most favorable to the government. <u>United States v. Emmanuel</u>, 565 F.3d 1324, 1330 (11th Cir.

16

2009).

Mr. Sarcona's argument assumes that Supreme Court precedent and our own case law have not already dictated how to resolve these potential ambiguities. This assumption is mistaken. Regarding the scope of the definition of "labeling," the Supreme Court long ago addressed the matter of whether materials that travel independently of the product in question can be treated as "labeling" for the purposes of the FDCA. In Kordel v. United States, 335 U.S. 345, 69 S. Ct. 106 (1948), the Court held that where literature "supplements or explains" a product and "was designed for use in the distribution and sale of the [product]," "[t]he fact that it went in a different mail [is] wholly irrelevant." Id. at 350, 69 S. Ct. at 110; see also United States v. Urbuteit, 335 U.S. 355, 358, 69 S. Ct. 112, 114 (1948) ("The fact that the false literature leaves in a separate mail does not save the article from being misbranded."). That is because it is "the textual relationship," not a "physical attachment," "that is significant." Kordel, 335 U.S. at 350, 69 S. Ct. at 110. This reading of the statute, the Court reasoned, is simply "common sense." Id. at 349, 69 S. Ct. at 110. For, "to hold that these drugs would be misbranded if the literature had been shipped in the same container but not misbranded if the literature left in the next or in the preceding mail," would "create an obviously wide loophole." Id. at 349, 69 S. Ct. at 109.

Here, the evidence indisputably showed that the promotional materials and the product "had a common origin and a common destination," and that the materials were "used in the sale" of LipoBan and "explained [its] use[]." Id. at 348, 69 S. Ct. at 109. While the materials and the product may not have been sent together in one package, we note the interdependency between them, id., and the "integrated nature of the transactions." Id. at 350, 69 S. Ct. at 110. Consequently, there was sufficient evidence for the jury to conclude that "the advertising matter that was sent was designed to serve and did in fact serve the purposes of labeling." Urbuteit, 335 U.S. at 357, 69 S. Ct. at 113. And under Kordel, the materials the jury found Mr. Sarcona to have prepared and sent clearly fell within the scope of the statutory definition of "labeling."

Regarding the issue of whether the statute's misbranding prohibitions apply only to the product's "label" as opposed to the product's "labeling," Mr. Sarcona's claim of ambiguity is also unavailing. We have repeatedly held that where there is no ambiguity in the text of a provision, we should not consider the heading or title in order to construe the provision. Essex Ins. Co. v. Zota, 466 F.3d 981, 989–90 (11th Cir. 2006); United States v. Ferreira, 275 F.3d 1020, 1029 (11th Cir. 2001); United States v. Chastain, 198 F.3d 1338, 1353 (11th Cir. 1999); Scarborough v. Office of Personnel Mgmt., 723 F.2d 801, 811 (11th Cir. 1984). This approach is

mandated by the Supreme Court's instruction that "the title of a statute and the heading of a section cannot limit the plain meaning of the text. For interpretative purposes, they are of use only when they shed light on some ambiguous word or phrase. . . . [T]hey cannot undo or limit that which the text makes plain." Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co., 331 U.S. 519, 528–29, 67 S. Ct. 1387, 1392 (1947).

Mr. Sarcona's claim of ambiguity is premised on the supposed conflict between the heading and text. When only the text is considered, however, no ambiguity exists because the statute unambiguously prohibits misbranding in "labeling," and that term is clearly defined. See 21 U.S.C. § 321(m). Under these circumstances, we do not allow the heading to undo that which the text makes plain. We therefore reject Mr. Sarcona's claim that the statute is ambiguous. And since there was no ambiguity, we hold the evidence was sufficient to convict Mr. Sarcona for misbranding in violation of the FDCA.

## C.

Mr. Sarcona contends that the First Amendment requires reversal of his mail and wire fraud convictions, as well as his conspiracy convictions. He claims that there was some scientific support for his claims and that, while he exaggerated the weight loss benefits of LipoBan, his exaggerations were mere puffery. Mr.

19

Sarcona argues that as a businessman he had a First Amendment right to advertise his product aggressively.

Mr. Sarcona and the government disagree about what standard of review should be applied here. However, under either de novo or plain error review, Sarcona's argument fails. It is well-established that the First Amendment does not protect commercial speech that is fraudulent or misleading. Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of NY, 447 U.S. 557, 562–63, 566, 100 S. Ct. 2343, 2349–51 (1980). There was sufficient evidence for the jury to find that Mr. Sarcona intentionally presented materially false and misleading information about the product's weight-loss benefits, the company, the "medical director" behind the product, and a study being conducted by the company. Because the evidence was sufficient to show that Mr. Sarcona's advertising went far beyond mere puffery and into the realm of fraud and deception, he cannot claim protection under the First Amendment.

## D.

Mr. Sarcona argues that his money laundering conspiracy and substantive promotion money laundering convictions should be vacated in light of United States v. Santos, 553 U.S. 507, 128 S. Ct. 2020 (2008). In Santos, the Supreme Court reversed a money laundering conviction arising from an illegal gambling

20

enterprise. A plurality opinion concluded that proceeds means "profits" as opposed to "receipts." Id. at 514, 128 S. Ct. at 2025. The controlling concurrence of Justice Stevens, however, limited this holding to certain contexts. See id. at 526–28, 128 S. Ct. at 2032–34 (Stevens, J., concurring in the judgment). Mr. Sarcona argues that under Santos his convictions should be vacated because the government only proved he had conspired to launder the "gross receipts" of fraudulent activity, not "profits." We review this question de novo. United States v. Delancy, 502 F.3d 1297, 1304 (11th Cir. 2007).

We have previously declined to recognize the broad interpretation of Santos that Mr. Sarcona advances here. See United States v. Jennings, 599 F.3d 1241, 1252 (11th Cir. 2010); United States v. Demarest, 570 F.3d 1232, 1242 (11th Cir. 2009). Instead, observing Santos's "limited precedential value," Demarest, 570 F.3d at 1242, we have interpreted the holding in Santos "in its narrowest form," that is, merely "that the gross receipts of an unlicensed gambling operation [are] not 'proceeds' under section 1956." Jennings, 599 F.3d at 1252. In non-gambling contexts, we remain bound by a definition of proceeds that "includes receipts as well as profits." Id. Because the proceeds did not come from an unlicensed gambling operation, they meet the terms of the statute as we have defined it, and Mr. Sarcona's argument for why his convictions should be vacated therefore fails.

21

E.

Finally, Mr. Sarcona argues that one of the government's expert witnesses, IRS Agent Stephan Robinson, testified outside the bounds of Federal Rule of Evidence 702 by explaining legal concepts and offering his opinion about Mr. Sarcona's guilt. Mr. Sarcona maintains that the District Court abused its discretion by allowing this testimony, and prejudice resulted. We review for an abuse of discretion, Emmanuel, 565 F.3d at 1332, and conclude that this argument also lacks merit.

We have previously recognized that admission of "expert testimony on [the concealment] practices of criminals" is appropriate for educating lay jurors on the significance of relevant facts. United States v. Garcia-Emanuel, 14 F.3d 1469, 1476 (11th Cir. 1994). Other Circuits have upheld admission of expert testimony for the specific purpose of educating jurors about money laundering. See, e.g., United States v. Nektalov, 461 F.3d 309, 318 (2d Cir. 2006); United States v. Wilson, 355 F.3d 358, 362 (5th Cir. 2003). Based on his extensive experience in investigating fraud and money laundering cases, Agent Robinson testified about the manner in which persons may launder money and explained that some of Mr. Sarcona's financial activities raised "red flags" for those investigating money laundering. He never offered an opinion regarding Mr. Sarcona's guilt or

22

innocence.  In addition, the District Court properly instructed the jury regarding consideration of expert opinion testimony.  For these reasons, we hold that the District Court did not abuse its discretion in admitting the testimony.

For each of these foregoing reasons, we **AFFIRM** Mr. Sarcona's convictions on all counts.